

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 4, 2024**

_____
**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BUCA TEXAS RESTAURANTS, L.P., *et al.*,[1] | § | Case No. 24-80058 (SGJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS
AND LIABILITIES, (B) AUTHORIZING THE DEBTORS TO ASSUME
AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION WITH THE SALE, AND (C) GRANTING RELATED RELIEF**

Upon the *Debtors' Emergency Motion for Entry of (I) an Order (A) Approving Bidding*

*Procedures and Designating A Stalking Horse Bidder, (B) Scheduling a Bid Deadline, Auction,*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' federal tax identification number are as follows:  BUCA Texas Restaurants, L.P. (3262); BUCA Texas Beverage, Inc. (3995); BUCA C, LLC (8220); BUCA Sales & Marketing, LLC (4258); BUCA Investments, Inc. (5575); BUCA Restaurants, Inc. (9725); BUCA Restaurants 2, Inc. (2187); BUCA (Celebration), LLC (3412); BUCA (Ex), LLC (3092); BUCA (Minneapolis), Inc. (2474).  The Debtors' principal offices are located at 4700 Millenia Boulevard, Suite 400, Orlando, Florida 32839.

*and Sale Hearing and Approving the Form and Manner of Notice Thereof, and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof; and (II) an Order Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, and Interests and Granting Related Relief* [Docket No. 100] (the "Sale Motion"),[2] filed by the above captioned debtors and debtors in possession (collectively, the "Debtors" or the "Sellers"), seeking entry of this order (this "Sale Order") for, among other things, approval of: (a) the sale of substantially all of the Debtors' assets pursuant to the APA (as defined below) free and clear of Liens,[3] Claims (as defined in section 101(5) of the Bankruptcy Code), and interests, (b) the assumption and assignment of executory contracts and unexpired leases of the Debtors as may be requested by the Purchaser (as defined below) and the proposed cure amounts with respect thereto (the "Cure Costs"), and (c) the assumption of certain liabilities, all as more fully set forth in the Sale Motion;

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

[3] The term "Lien" as used in this Sale Order shall include all liens, interests, rights encumbrances, rights of offset, restrictions, leases, option rights or claims, obligations, liabilities, indentures, loan agreements, guaranties, demands, contractual commitments or interests in respect of the Debtors or any property of the Debtors, equity interests, licenses, instruments, conditional sale rights or other title retention agreements, rights of first refusal, consent rights, contract rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, regulatory violations, judgments, decrees of any court or foreign or domestic governmental or quasi-governmental entity, debts arising in any way in connection with any agreements, acts or failures to act and reclamation rights whether choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected including the following: (1) any "Lien" as such term is used in the APA; (2) employment or labor agreements; (3) all mortgages, deeds of trust, hypothecations, pledges, security interests or charges of any kind or nature; (4) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including any pension plan of the Debtors; (5) any other employee, workers' compensation, occupational disease or unemployment or temporary disability related claim, including claims that might otherwise arise under or pursuant to (a) ERISA, Pub. L. No. 93-406, 88 Stat. 829 (1974); (b) the FLSA, 29 U.S.C. §§ 201 *et seq.,* as amended; (c) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* as amended; (d) the Federal Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.,* as amended; (e) the NLRA, 29 U.S.C. §§ 151 *et seq.*, as amended; (f) the Worker Adjustment and Retraining Act of 1988, 28 U.S.C. §§ 2101 *et seq.*; (g) the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.*, as amended; (h) the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*, as amended; (i) state discrimination laws; (j) state unemployment compensation laws or any other similar state laws; or (k) any other state or federal benefits or claims relating to any employment with any of the Debtors or any of their respective predecessors; (6) any bulk sales or similar laws; (7) any tax statutes or ordinances, including the Internal Revenue Code of 1986, as amended; (8) any theories of successor liability, including any theories on product liability grounds; and (9) any environmental or other liens, Claims, encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature arising from existing conditions on or prior to the Closing Date.

4883-2571-2118

and the U.S. Bankruptcy Court for the Northern District of Texas (Dallas Division) (the "Court")
having entered the *Order (A) Approving Bidding Procedures and Designating a Stalking Horse
Bidder, (B) Scheduling a Bid Deadline, Auction, and Sale Hearing and Approving the Form and
Manner of Notice Thereof, and (C) Approving Cure Procedures and the Form and Manner of
Notice Thereof* [Docket No. 177] (the "Bidding Procedures Order"); and the Court having entered
the *Order Granting Debtors' Emergency Motion to Continue Sale Hearing* [Docket No. 316]
(the "Extension Order"); and the Court being satisfied that the relief requested in the Sale Motion
is necessary and in the best interests of the Debtors and their estates; and it appearing that sufficient
notice of the Sale Motion has been given, and that no other or further notice is required; and this
Court having reviewed the Sale Motion and having considered the evidence and arguments
presented at a hearing on November 1, 2024 (the "Sale Hearing"); and this Court having
determined that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing
establish just cause for the relief granted herein; and after due deliberation and sufficient cause
appearing therefor;

It is hereby **FOUND, CONCLUDED, AND DETERMINED THAT**:[4]

A.    **Jurisdiction and Venue**.  The Court has jurisdiction to hear and determine the Sale
Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. §
157(b)(2)(A), (N), and (O).  Venue in this district is proper under 28 U.S.C. § 1408 and 1409.

B.    On August 4 and 5, 2024 (August 4, 2024, the "Petition Date"), the Debtors each
filed a voluntary petition under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the
Debtors have continued to operate their business and manage their property as debtors in

---

[4] The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for
the purposes of rule 7052 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), made applicable
pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as
such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

4883-2571-2118

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

C.    **Notice**. As evidenced by the certificates of service filed with the Court, proper, timely, adequate, and sufficient notice of (a) the Sale Motion, (b) the sale of the Purchased Assets (as defined below) to the Purchaser (as defined below) pursuant to (i) the bidding procedures authorized by the Court in the Bidding Procedures Order (the "Bidding Procedures") and (ii) the APA and the transactions contemplated in connection therewith (the "Sale"), (c) the assumption and assignment to the Purchaser of certain executory contracts and unexpired leases as described and identified more fully in the APA (collectively, the "Assumed Contracts"), (d) the Cure Costs, (e) the Successful Bidder, (f) the Sale Hearing, and (g) all deadlines related thereto has been provided by the Debtors to each party entitled thereto in accordance with the Bidding Procedures Order and the Extension Order. A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities.

D.    The Debtors filed with the Court and served upon the non-Debtor counterparties to the Assumed Contracts a *Notice of Executory Contracts and Unexpired Leases Subject to Possible Assumption and Assignment and Proposed Cure Amounts* [Docket No. 218], a *Notice of Assumed Contract Schedule and Amended Cure Amounts* [Docket No. 325], and *Notice of Supplemented and Amended Assumed Contract Schedule and Amended Cure Amounts* [Docket No. 381] (collectively, the "Cure Notice"), identifying, among other things, the Cure Costs in accordance with the Bidding Procedures Order and Extension Order. The service of the Cure Notice was sufficient under the circumstances and in full compliance with the Bidding Procedures Order and the Extension Order, and no further notice need be provided in respect of the Debtors' assumption and assignment to the Purchaser of the Assumed Contracts, the Cure Costs, if any, or the Sale. All

4883-2571-2118

non-Debtor counterparties to the Assumed Contracts have had an adequate opportunity to object to the assumption and assignment of the Assumed Contracts and the Cure Costs.

E. The disclosures made by the Debtors concerning the Sale Motion, the APA, the Sale, the Purchaser, and the Sale Hearing were good, complete, and adequate. A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all of the Debtors' creditors and other parties in interest in these Chapter 11 Cases.

F. The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale (and the transactions contemplated in connection therewith), the assumption and assignment to the Purchaser of the Assumed Contracts, the Cure Costs, the Sale Hearing, and all deadlines related thereto is or shall be required.

G. **APA**. The assets being sold to the Purchaser (the "Purchased Assets," as defined in the APA as the "Assets"), as more fully described in that certain Asset Purchase Agreement, attached hereto as **Exhibit 1** (the "APA") between the Debtors and BDB Intermediate, LLC (the "Purchaser"), pursuant to which the Sellers have agreed to sell the Purchased Assets to the Purchaser, constitute property of the Sellers' bankruptcy estates and title thereto is vested in the Sellers' estates within the meaning of section 541 of the Bankruptcy Code. The Debtors are the sole and lawful owners of the Purchased Assets.

H. **The Sale Process**. The Sale is duly authorized pursuant to sections 102(1), 105, 363, 365, and 541 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014. As demonstrated by (i) the testimony and other evidence adduced at the Sale Hearing, (ii) the representations of counsel made on the record at the Sale Hearing, and (iii) the docket of this case, the Debtors have marketed the Purchased Assets and conducted all aspects of the Sale process

4883-2571-2118

at arms'-length, in good faith, and in compliance with the Bidding Procedures, the Bidding Procedures Order, and the Extension Order.  The marketing process undertaken by the Debtors and their professionals, agents, and other representatives with respect to the Purchased Assets has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders.  The Bidding Procedures were duly noticed, were substantively and procedurally fair to all parties, and the Sale was conducted in a diligent, non-collusive, fair, and good faith manner, in accordance with the Bidding Procedures.  The APA constitutes the highest and best offer for the Purchased Assets.

I.        The deadline for submitting a bid for the Debtors' assets passed on October 2, 2024, at 4:00 p.m. (prevailing Central Time) (the "Bid Deadline") in accordance with the Bidding Procedures and Bidding Procedures Order.  No qualified bids, other than the APA, were received by the Bid Deadline.  After the Bid Deadline, the Debtors, after consultation with the Official Committee of Unsecured Creditors (the "Committee"), determined in a valid and sound exercise of their business judgment that the transactions contemplated by the APA were the highest or otherwise best bid and, therefore, Purchaser's bid was designated as the successful bid (the "Successful Bid").  On October 4, 2024, the Debtors filed their *Notice of (I) Cancellation of Auction, and (II) Designation of Main Street Capital Corporation as Successful Bidder, Including the Proposed Form of the Asset Purchase Agreement* [Docket No. 296] (the "Notice of Successful Bidder"), identifying the Purchaser as the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures Order.  As established by the record of the Sale Hearing, the Bidding Procedures Order and Extension Order have been complied with in all material respects by the Debtors and the Purchaser.  The Bidding Procedures afforded a full, fair, and

reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the Purchased Assets.

J.      Through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, the Debtors: (a) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Purchased Assets; (b) provided potential purchasers, upon request, sufficient due diligence information to enable them to make an informed judgment on whether to bid on the Purchased Assets and to submit the materials required under the Bidding Procedures Order by the Bid Deadline; (c) considered any Qualified Bids submitted on or before the Bid Deadline; and (d) conducted the sale process in a diligent, non-collusive, fair, and good faith manner.

K.      **Business Justification**.  The Debtors have articulated good and sufficient business reasons for the Court to: (i) approve the APA, and, subject to the terms of this Sale Order, authorize the Debtors' consummation of the Sale, including the sale of the Purchased Assets to the Purchaser and its permitted assigns pursuant to the terms of the APA; (ii) authorize and approve the assumption, assignment, or assumption and assignment of the Assumed Contracts and Assigned Postpetition Contracts as set forth herein and in the APA on the Closing Date (defined below); and (iii) authorize and approve the assumption of the Assumed Liabilities as set forth in the APA.  Entry into the APA and consummation of the Sale are sound exercises of the Debtors' business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.

L.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose for: (i) the sale of the Purchased Assets outside of the ordinary course of business pursuant to Bankruptcy Code section 363(b) prior to and outside of a plan of

4883-2571-2118

reorganization because of the Debtors' current financial position; (ii) a restriction on the Debtors

pursuing, considering, or accepting any further offers for the Purchased Assets from and after the

entry of this Sale Order through the earlier of the consummation of the Sale or termination of the

APA in accordance with its terms; and (iii) the immediate consummation of the APA. Such

circumstances and purposes include: (a) the Debtors conducted a robust marketing process to sell

the Purchased Assets and the APA constitutes the highest and best offer for the Purchased Assets;

(b) the APA and the closing of the Sale present the best opportunity to realize the highest value for

the Purchased Assets; (c) there is risk of deterioration of the value of the Purchased Assets if the

Sale is not consummated in accordance with the terms of the APA and this Sale Order; (d) the APA

and the sale of the Purchased Assets to the Purchaser provide greater value to the Debtors' estates

than would be provided by any other presently available alternative; (e) the Bidding Procedures

utilized were designed to yield the highest or otherwise best bids for the Purchased Assets; and

(f) the Purchaser would not agree to purchase the Purchased Assets pursuant to the terms of the

APA and this Sale Order if the Purchased Assets remained subject to higher or better offers after

the entry of this Sale Order. To maximize the value of the Purchased Assets and preserve the

viability of the operations to which the Purchased Assets relate, it is essential that the Sale occur

within the time constraints set forth in the APA and this Sale Order and that the Purchaser be

protected against any further offers for the Purchased Assets.

      M.    **Good Faith**. The APA was negotiated, proposed, and is undertaken by the Debtors

and the Purchaser at arms'-length, without collusion or fraud, and in good faith within the meaning

of Bankruptcy Code section 363(m). The Purchaser is a good-faith purchaser under

section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded

thereby, including in the event that this Sale Order or any portions thereof is appealed, or is

4883-2571-2118

reversed or modified on appeal.  The Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets, and agreed to, and did, subject its bid to the competitive Bidding Procedures.  As established by the record of the Sale Hearing, the Debtors and the Purchaser have complied with the Bidding Procedures and the Bidding Procedures Order in all material respects.  The Bidding Procedures afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the Purchased Assets.  Neither the Debtors, nor the Purchaser, nor any affiliate of the Purchaser has engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.  As a result of all of the foregoing, the Purchaser is entitled to the protections of Bankruptcy Code section 363(m), including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with these cases.  The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.

N.      An injunction against creditors of the Debtors and third parties pursuing the Purchaser for Excluded Liabilities is necessary to induce the Purchaser to close the Sale; the issuance of such an injunction is therefore necessary to avoid irreparable injury to the Debtors' estates, and will benefit all of the Debtors' creditors.

O.      **Authority**.  The Debtors (i) have full corporate power and authority to execute the APA, and the Sale by the Debtors to the Purchaser has been duly and validly authorized by all necessary corporate action, (ii) have all of the corporate power and authority necessary to consummate the Sale and all transactions contemplated by the APA, (iii) have taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtors of the

9

Sale and all transactions contemplated thereby, and (iv) require no consents or approvals that have not been obtained, other than the Court's entry of this Sale Order and those expressly provided for in the APA, to consummate such transactions.

P.      **Highest and Otherwise Best Offer**.  The total consideration provided by the Purchaser for the Purchased Assets represents the highest and best offer received by the Debtors, and the amount of aggregate consideration provided by the Purchaser to the Debtors pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, applicable state laws, including the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other such applicable laws, and may not be avoided under Bankruptcy Code section 363(n) or any provision of chapter 5 of the Bankruptcy Code or under any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  No other person or entity or group of persons or entities has offered to purchase the Purchased Assets for an amount of aggregate consideration that would provide greater value to the Debtors' estates than the Purchaser. The Debtors' determination that the APA constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.  Such business reasons include the facts that (i) there is substantial risk of deterioration of the value of the Purchased Assets if the Sale is not consummated quickly given limited cash on hand and access to additional funding; (ii) the Sale set forth in the APA constitutes the highest and best offer for the Purchased Assets; and (iii) the APA and the Closing will present the best opportunity to realize the value of the Debtors' business on a going concern basis and to avoid decline and devaluation of the Debtors' business. The Court's approval of the Sale Motion, the Sale, and the APA, and the

4883-2571-2118

immediate consummation thereof, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

Q.  **Valid Transfer**.  As of the Closing, pursuant and subject to the terms of the APA, the transfer of the Purchased Assets and the Sale will effect a legal, valid, enforceable, and effective transfer of the Purchased Assets and will vest the Purchaser with all of the Debtors' right, title, and interest in the Purchased Assets, free and clear of all Liens (except for Permitted Liens), Claims, encumbrances, and other interests of any kind or nature whatsoever (other than Assumed Liabilities).

R.  **Free and Clear**.  The Purchaser would not have entered into the APA and would not have consummated the Sale, thus adversely affecting the Debtors, their estates, and their creditors, unless both (i) the Sale and (ii) the assumption and assignment of the Assumed Contracts to the Purchaser were free and clear of all Liens (except for Permitted Liens), Claims, encumbrances, and other interests of any kind or nature whatsoever (other than Assumed Liabilities), except as specifically set forth in paragraph 25 of this Sale Order.  Claims shall include Excluded Liabilities, all debts arising under, relating to, the Purchased Assets, or in connection with any act of any Debtor or claims, liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, restrictive covenants, covenants not to compete, rights to refunds, escheat obligations, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Debtors' chapter 11 cases, and whether imposed by agreement, applicable law, equity, or otherwise (including rights with respect to claims and encumbrances (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or Purchaser's

11

interests in the Purchased Assets, or any similar rights, (ii) in respect of taxes owed by the Debtors

for periods prior to the Closing Date, including sales, income, use or any other type of tax; or

(iii) in respect of restrictions, rights of first refusal, charges or interests of any kind or nature, if

any, including any restriction of use, voting, transfer, receipt of income or other exercise of any

attributes of ownership) relating to, accruing or arising any time prior to the Closing Date.

S.      **Satisfaction of 363(f) Standards**.  The Debtors may sell the Purchased Assets free

and clear of all Liens (except for Permitted Liens), Claims, encumbrances, and other interests of

any kind or nature whatsoever (other than Assumed Liabilities), because, in each case, one or more

of the standards set forth in section 363(f)(l)–(5) of the Bankruptcy Code has been satisfied.  All

parties in interest, including any holders of Liens, Claims, encumbrances, and other interests and

any non-Debtor counterparties to the Assumed Contracts, that did not object, or who withdrew

their objection, to the Sale, the Sale Motion, the assumption and assignment of the applicable

Assumed Contract, including the associated Cure Cost, have consented to the relief granted herein

pursuant to section 363(f)(2) of the Bankruptcy Code.  Those (i) holders of Liens and (ii) non-

Debtor parties to Assumed Contracts who did object fall within one or more of the other

subsections of section 363(f) of the Bankruptcy Code.

T.      If, except with respect to Assumed Liabilities and Permitted Encumbrances

provided herein or under the APA, the Sale was not free and clear of all Excluded Liabilities, or if

the Purchaser would, or in the future could, be liable for any of the Excluded Liabilities, the

Purchaser would not have entered into the APA and would not consummate the Sale, thus adversely

affecting the Debtors and their bankruptcy estates and creditors.

U.      **No Successor Liability**.  By consummating the Sale, the Purchaser is not a mere

continuation of the Debtors or their estates, and there is no continuity, no common identity, and no

continuity of enterprise between the Purchaser and the Debtors. The Purchaser is not holding itself

out to the public as a continuation of the Debtors. The Purchaser is not a successor to the Debtors

or the Debtors' estates by reason of any theory of law or equity, and the Sale does not amount to a

consolidation, merger, or *de facto* merger of the Purchaser or the Debtors. The Purchaser will not

assume or in any way be responsible for any obligation or liability of the Debtors and/or the

Debtors' estates except in respect of the Assumed Liabilities, and as expressly provided in this Sale

Order or the APA. The Purchaser would not have acquired the Purchased Assets but for the

foregoing protections against potential claims based upon "successor liability" or similar theories..

V.    **Assumed Contracts and Cure Costs**.  The Debtors have demonstrated that the

assumption and assignment of the Assumed Contracts and Assigned Postpetition Contracts (as

defined in the APA) to the Purchaser in connection with the consummation of the Sale is an

exercise of the Debtors' sound business judgment and is in the best interests of the Debtors, their

estates and creditors, and other parties in interest.   The Assumed Contracts and Assigned

Postpetition Contracts being assigned to the Purchaser are an integral part of the APA and the Sale

and, accordingly, the assumption and assignment of the Assumed Contracts and Assigned

Postpetition Contracts is reasonable and enhances the value of the Debtors' estates.  Any objections

to the assumption and assignment of any of the Assumed Contracts by the Purchaser in accordance

with the APA that have not been resolved or adjourned by agreement of the parties, are hereby

overruled.  Any non-Debtor counterparty to an Assumed Contract that has not actually filed with

the Court an Assumption Objection (as defined below) in accordance with the terms of the Bidding

Procedures Order and Cure Notice is deemed to have consented to such assumption and

assignment on the terms set forth in this Sale Order and the APA.

W.      The Debtors and the Purchaser (including any designees), as applicable under the APA, have, including by way of entering into the APA, and agreeing to the provisions relating to the Assumed Contracts therein, (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser (including any designees) has, based upon the record of these proceedings, provided adequate assurance of future performance of and under the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  No default exists in the Debtors' performance under the Assumed Contracts as of the Closing Date other than the failure to pay Cure Costs or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.  The Purchaser's promise under the APA to perform the obligations under the Assumed Contracts after Closing shall constitute sufficient adequate assurance of future performance under the Assumed Contracts being assigned to the Purchaser within the meanings of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.  The Cure Costs are hereby found to be the sole amounts necessary to cure any and all defaults under the Assumed Contracts for amounts that have become due and owing under the Leases under section 365(b) of the Bankruptcy Code.

X.      **Allocation of Purchase Price**.  The Credit Bid shall be comprised solely of the DIP Obligations.

Y.      **No *Sub Rosa* plan**.  The Sale does not constitute a *sub rosa* chapter 11 plan.  The sale and assignment of the Purchased Assets and Assumed Liabilities outside of a plan of

14

reorganization pursuant to the APA neither impermissibly restructures the rights of the Debtors'
creditors nor impermissibly dictates a chapter 11 plan for any of the Debtors.

Z.      **Opportunity to Object**.  A fair and reasonable opportunity to object or be heard
with respect to the Sale Motion and the relief requested therein has been afforded to all interested
persons and entities.

AA.     **Final Order**.  This Sale Order constitutes a final order within the meaning of
28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent
necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as
made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason
for delay in the implementation of this Sale Order, and, sufficient cause having been shown, waives
any such stay.  The Debtors have demonstrated compelling circumstances and a good, sufficient,
and sound business purpose and justification for the immediate approval and consummation of the
Sale contemplated by the APA.  The Purchaser may consummate the Sale subject to the terms of
this Sale Order.

BB.     **Automatic Stay**.  The automatic stay pursuant to section 362 of the Bankruptcy
Code is hereby modified with respect to the Debtors to the extent necessary, without further order
of the Bankruptcy Court, to allow the Purchaser to deliver any notice provided for in the APA and
allow the Purchaser to take any and all actions permitted under the APA, in each case in accordance
with the terms and conditions thereof.

CC.     **Time is of the Essence**.  Time is of the essence in consummating the Sale.  The
consummation of the Sale as soon as practicable is necessary both to preserve and maximize the
value of the Debtors' assets for the benefit of the Debtors, their estates, their creditors, interest
holders and all other parties in interest in these chapter 11 cases, and to provide the means for the

Debtors to maximize creditor and interest holder recoveries. Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Sale Motion is granted as set forth herein, and the Sale contemplated thereby and by the APA is approved as set forth in this Sale Order, with the APA being incorporated in this Sale Order as if fully set forth herein.

2.      All objections to the Sale Motion or the relief granted herein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled on the merits with prejudice.

3.      Notice of the Sale Motion, and the assumption and assignment of the Assumed Contracts and Leases (including proposed Cure Amounts related thereto), the Sale Hearing, and the Sale was fair and equitable under the circumstances and complied in all respects with the Bidding Procedures, sections 102(1), 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, 9006, and 9007.

## Approval of the APA

4.      The APA and all other ancillary documents, including all of the terms and conditions thereof, and the Sale contemplated thereby, are hereby approved in all respects and the Debtors and the Purchaser are hereby authorized and empowered to fully perform under, consummate, and implement the terms of the APA.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, acting by and through their existing agents, representatives, and officers, are authorized and directed to execute and deliver, perform under, consummate, implement, comply with, and close the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to

16

implement the APA and the Sale, and consummate the Sale pursuant to and in accordance with the terms and conditions of the APA and this Sale Order. The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after Closing, any expenses or costs that are required to be paid in order to consummate the transactions contemplated by the APA or perform their obligations under the APA.

6.      The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the APA, together with all additional instruments, documents, and other agreements that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Purchased Assets, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA, this Sale Order, and any such other ancillary documents, without any further corporate action or orders of this Court.

7.      The Debtors, their estates, and their respective officers, members, managers, partners, agents, representatives, and attorneys, are authorized, subject to the terms and conditions contained in the APA and this Sale Order to carry out all of the provisions of the APA and any related agreements or instruments; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the APA and any related agreements or instruments; to take any and all actions contemplated by the APA, any related agreements or instruments, or this Sale Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, termination statements, indentures, mortgages, quitclaim deeds, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary, desirable or

17

appropriate to implement, effectuate, and consummate, the APA, any related agreements or instruments and this Sale Order, all without further application to, or order of, this Court or further action by their respective officers, members, managers, partners, agents, representatives, and attorneys. The Debtors and their estates are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Unit (as defined in the Bankruptcy Code) any and all certificates, agreements, or amendments necessary or appropriate to effectuate this Sale Order and the APA, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable Governmental Units or as they may determine are necessary, desirable or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Sale Order shall constitute all approvals and consents, if any, required by the corporate laws of the State of Delaware and all other applicable business, corporation, non-profit, limited liability partnership, trust, and other laws of the applicable Governmental Unit with respect to the implementation and consummation of the APA, any related agreements or instruments and this Sale Order.

8.      This Sale Order shall be binding in all respects upon the Debtors and their estates, successors, and assigns, all creditors of and equity holders in any Debtor, and any and all other parties in interest, including any and all holders of Liens (except for Permitted Liens), claims, encumbrances, and other interests of any kind or nature whatsoever (other than Assumed Liabilities), including holders of any rights or claims based on any putative successor or transferee liability, of any kind or nature whatsoever in the Purchased Assets, all non-Debtor parties to the Assumed Contracts and Assigned Postpetition Contracts, and any trustee or successor trustee or

4883-2571-2118

administrator appointed in these chapter 11 cases or upon a conversion.  The APA and the Sale are

not subject to rejection or avoidance (whether through any avoidance or recovery, claim, action,

or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar state or federal

law or any other cause of action) by the Debtors, any chapter 7 or chapter 11 trustee of the Debtors'

bankruptcy estates, or any other person or entity.   The APA, this Sale Order, and the Debtors'

obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or

otherwise affected by any chapter 11 plan proposed or confirmed in these bankruptcy cases, any

order confirming any chapter 11 plan, or any subsequent order of this Court without the prior

written consent of the Purchaser.   In furtherance of the foregoing, any estate representative,

including a trustee or administrator appointed in this case under any chapter 11 plan confirmed in

these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code, shall be

obligated to comply with the preservation and production obligations of the Debtors set forth in

the APA.  Nothing contained in any chapter 11 plan confirmed in these chapter 11 cases or the

confirmation order confirming any such chapter 11 plan shall conflict with or derogate from the

provisions of the APA or this Sale Order.  This Sale Order and the APA shall inure to the benefit

of the Debtors, their estates, their creditors, the Purchaser, and their respective successors and

assigns.

9.       Subject to the terms of the APA, the APA and any related agreements, documents,

or other instruments may be modified, amended, or supplemented by the parties thereto in a writing

signed by all parties, after consultation with the Committee with respect to material modifications,

and in accordance with the terms thereof, without further order of this Court, provided that any

such modification, amendment, or supplement does not have a material adverse effect on the

Debtors' estates.

4883-2571-2118

**Transfer of the Purchased Assets**

10.     Except as expressly permitted or otherwise specifically provided for in the APA or this Sale Order, pursuant to sections 105(a), 363(b), 363(f), 365(b), 365(f), and 541 of the Bankruptcy Code or any other applicable section of the Bankruptcy Code, upon Closing, the Purchased Assets shall be transferred to the Purchaser, and such transfer shall constitute a legal, valid, binding, and effective transfer of the Purchased Assets free and clear of all Excluded Liabilities, including Liens (except for Permitted Liens), Claims, encumbrances, and other interests of any kind or nature whatsoever (other than Assumed Liabilities), pursuant to section 363(f) of the Bankruptcy Code.  Upon Closing, the Purchaser shall take title to and possession of the Purchased Assets subject only to the Assumed Liabilities and Permitted Liens.

11.     On the Closing Date, this Sale will be construed to and will constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Purchaser pursuant to the terms and conditions set forth in this Sale Order and the APA.

12.     Except for Assumed Liabilities and Permitted Encumbrances provided herein or under the APA, all persons and entities, including the Debtors, employees, former employees, all debt holders, equity holders, administrative agencies, Governmental Units, tax and regulatory authorities, secretaries of state, federal, state, and local officials, lenders, contract parties, bidders, lessors, and other parties in possession of any of the Purchased Assets at any time, trade creditors, and all other creditors holding or asserting Liens, Claims, or Excluded Liabilities of any kind or nature whatsoever against or in the Debtors or in the Debtors' interests in the Purchased Assets (whether known or unknown as of the Closing Date, now existing or hereafter arising, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, whether imposed by agreement, understanding, law, equity, or otherwise), shall be and hereby are forever

20

barred, estopped, and permanently enjoined from asserting, prosecuting, commencing, continuing, or otherwise pursuing in any manner any action, claim, or other proceeding of any kind, directly or indirectly, against the Purchaser or any of its affiliates, predecessors, successors, or assigns or any of their respective current and former members, managers, officers, directors, managed funds, investment advisors, attorneys, employees, partners, principals, affiliates, shareholders (or equivalent), financial advisors, and representatives (each of the foregoing in its individual capacity), their property, or the Purchased Assets in respect of Liens, Claims, or Excluded Liabilities that arise under or out of, in connection with, or in any way relate to, the Debtors, the Purchased Assets, the Assumed Contracts, the operation of the Debtors' business on or prior to the Closing Date, the sale, or the transfer of the Purchased Assets or the Assumed Contracts to the Purchaser. Actions that are barred include: (i) the commencement or continuation of any action or other proceeding, (ii) the enforcement, attachment, collection, or recovery of any judgment, award, decree or order, (iii) the creation, perfection, or enforcement of any Lien, Claim, Interest, or encumbrance, except for Assumed Liabilities or Permitted Encumbrances provided herein or under the APA, (iv) the assertion of any right of setoff, not asserted prepetition, or subrogation claims against the Purchaser, (v) the commencement or continuation of any action that does not comply with, or is inconsistent with, the provisions of this Sale Order, any actions contemplated or taken in respect hereof, or the APA, and (vi) the revocation, termination, or failure or refusal to renew any governmental authorization or to acknowledge/accept assignment of any license, permit, registration, or governmental authorization or approval to operate any of the Purchased Assets or conduct the businesses associated with such Purchased Assets; *provided* that, for the avoidance of doubt, nothing in this paragraph shall limit the enforcement of the APA or rights in connection with Assumed Liabilities or Permitted Encumbrances.  On or before the Closing Date, each of the

Debtors' creditors is directed to execute such documents and take all other actions as may be deemed by the Purchaser to be reasonably necessary or desirable to release Liens (except for Permitted Liens), Claims, encumbrances, and other interests (other than Assumed Liabilities) on the Purchased Assets, if any, as provided for herein, as such Liens or liabilities may have been recorded or may otherwise exist.

13.    The Purchaser has given substantial consideration under the APA for the benefit of the Debtors, their estates, and creditors.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential interest or Claims pursuant to this Sale Order.

14.    The transfer of the Purchased Assets to the Purchaser pursuant to the APA shall constitute a legal, valid, and effective transfer of the Purchased Assets on the Closing Date, and shall vest the Purchaser with all of the Debtors' rights, title, and interests in the Purchased Assets free and clear of all Liens (except for Permitted Liens), Claims, encumbrances, and other interests of any kind or nature whatsoever (other than Assumed Liabilities), whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as transferee or successor or otherwise, of any kind, nature, or character whatsoever, including those Liens (except for Permitted Liens), Claims, encumbrances, and other interests of any kind or nature whatsoever (other than Assumed Liabilities) arising out of or on account of: (a) any employment, collective bargaining, or other labor agreements or the termination thereof; (b) any defined benefit, multiemployer, defined contribution, retirement, medical benefit, or any other employee pension, welfare, compensation, or other employee benefit plans, agreements, practices, or programs, including any pension plan of or related to any of the Debtors or any of Debtors' Affiliates or predecessors or any current or future employees of any of

the foregoing, or the termination of any of the foregoing; (c) the Debtors' Business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; (e) any employee, benefit, worker's compensation, occupational disease, or unemployment or temporary disability related claims or interests, including claims and interests that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Multiemployer Pension Plan Amendments Act of 1980, (xi) any other federal or state discrimination laws, (xii) state unemployment compensation laws or any other similar state and local laws, (xiii) state workers' compensation laws, or (xiv) any other state, local, or federal employee benefits laws, regulations, or rules, or other state, local, or federal laws, regulations, or rules relating to any employment with any of the Debtors or any of their respective predecessors; (f) any antitrust laws; (g) any product liability or similar laws, whether state or federal or otherwise; (h) any bulk sales or similar laws; (i) any federal state, or local tax statutes, regulations, or ordinances, including the Internal Revenue Code of 1986, as amended; and (j) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory, or any other theory of or related to successor liability; and the Debtors hereby waive and release the Purchaser from any such Liens, Claims, encumbrances, and other interests.

15.     All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to immediately surrender possession of such Purchased Assets to

4883-2571-2118

the Purchaser or its assignee.  Nothing herein shall prejudice the rights of the Purchaser to seek turnover from any and all Entities presently in possession, or on or after the Closing Date in possession, of some or all of the Purchased Assets.

16.     Unless otherwise ordered by the Court in a prior order, to the extent provided for in the APA, any and all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any of the Debtors under the Assumed Contracts are being transferred and assigned to, and shall be the property of, the Purchaser from and after the Closing, which transfer and assignment of security deposits or other deposits shall satisfy in full the requirements of section 365(l) of the Bankruptcy Code for all contracts, leases, and licenses assumed and assigned pursuant to this Sale Order or the APA.  Nothing herein shall require landlords holding security deposits to transfer such security deposits to the Purchaser, and landlords shall continue to hold all such security deposits pursuant to the terms of their Leases.

17.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens in the Purchased Assets conveyed pursuant to the APA and this Sale Order has not delivered to the Debtors, prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which the person or entity has with respect to the Purchased Assets or otherwise, then (a) the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets, and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Purchased

24

Assets of any kind or nature whatsoever.  For the avoidance of doubt, to the extent necessary, upon consummation of the transactions set forth in the APA, the Purchaser is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings, or financing statements recorded to attach, perfect, or otherwise notice any Lien that is extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code.

## Ad Valorem Taxes

18.    Except as otherwise provided in paragraph 19, below, the Sale of the Purchased Assets approved herein shall vest the Purchaser with all of the Debtors' right, title, and interest in the Purchased Assets free and clear of ad valorem, property, and similar tax liens for any pre-Closing period.

19.    The 2024 ad valorem taxes of the Texas Taxing Authorities [5] are Permitted Liens.  The Purchaser assumes full responsibility for the 2024 ad valorem taxes and shall be responsible for paying the ad valorem taxes in full, in the ordinary course of businesses, when due.  If not timely paid, the Texas Taxing Authorities may proceed with their nonbankruptcy collection rights against the Purchaser or the Assets, without leave or approval of the Court.  Any proration to the Debtors shall be credited to the Purchaser at closing or on terms agreed upon by the Debtors and Purchaser.  Any dispute regarding the proration of the ad valorem taxes between the Debtors and Purchaser shall have no effect on Purchaser's responsibility to pay the 2024 ad valorem taxes.  The Texas Taxing Authorities shall retain their respective liens against the taxable Assets, as applicable, until paid in full, including any applicable penalties or interest.

---

[5] The term "Texas Taxing Authorities" shall refer to: Dallas County, City of Frisco, Montgomery County and Tarrant County, and Frisco Independent School District.

4883-2571-2118

20.     Undisputed secured 2023 ad valorem personal property taxes owing by the Debtors

to the Texas Taxing Authorities shall be paid in full, including any statutory penalties or interest,

by the Debtors within ten calendar days following the Closing Date. The Texas Taxing Authorities

shall retain their statutory liens against the taxable property and their existing lien priority, until

the delinquent tax claims are paid in full, including statutory penalties or interest, if applicable, as

provided by the Texas Tax Code.  All parties' rights and defenses under applicable law and the

Bankruptcy Code with respect to the foregoing, including their right to dispute or object to the

validity or enforcement of the Tax Liens under applicable non-bankruptcy law, are fully preserved.

**Assumption and Assignment of Assumed Contracts and Assumed Liabilities**

21.     The Debtors are hereby authorized to and shall, in accordance with sections 105(a)

and 365 of the Bankruptcy Code, (a) assume the Assumed Contracts, (b) assign the Assumed

Contracts to the Purchaser, effective upon and subject to the occurrence of the Closing, and except

as specifically set forth in paragraph 25 of this Sale Order, free and clear of all Liens (except for

Permitted Liens), Claims, encumbrances, and other interests of any kind or nature whatsoever

(other than Assumed Liabilities), which Assumed Contracts by operation of this Sale Order shall

be deemed assumed and assigned effective as of Closing, and (c) execute and deliver to the

Purchaser such documents or other instruments as may be necessary to assign and transfer the

Assumed Contracts to the Purchaser.  The Purchaser's assumption of the Assumed Contracts on

the terms set forth in the APA is hereby approved, and all requirements and conditions under

sections 363 and 365 of the Bankruptcy Code for the assumption and assignment of the Assumed

Contracts by the Debtors to the Purchaser have been satisfied, or, upon Closing and payment of

the Cure Costs, shall be satisfied; *provided*, *however*, that pursuant to the APA, the Purchaser and

the Debtors shall be permitted, subject to the terms of the APA, to modify the list of Assumed

Contracts after the entry of this Sale Order.

26

22.     Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract on the consent of the non-Debtor counterparty thereto or allow the non-Debtor party to such Assumed Contract to terminate, recapture, impose any penalty, declare an event of default, condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, shall constitute unenforceable anti-assignment provisions that are void and of no force and effect for the purposes of the assumption and assignment of the Assumed Contracts to the Purchaser pursuant to this Sale Order only.

23.     Upon assignment to the Purchaser, (a) the Assumed Contracts shall remain in full force and effect for the benefit of the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, limits, or conditions such assignment or transfer; and (b) in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of the Debtors in each Assumed Contract free and clear of Liens (except for Permitted Liens), Claims, encumbrances, and other interests of any kind or nature whatsoever (other than Assumed Liabilities).

24.     The Purchaser is hereby substituted for all purposes as a party to all Assumed Contracts in the place of any applicable Debtor or Debtors party to any such Assumed Contracts, and the Purchaser shall have any and all rights and benefits of the respective Debtor or Debtors under all such Assumed Contracts without interruption or termination of any kind, and all terms applicable to such Debtor or Debtors shall apply to the Purchaser as if such Assumed Contracts were amended to replace such Debtor or Debtors with the Purchaser.

25.    Notwithstanding anything in the APA to the contrary, from and after the assumption and assignment of an Assumed Contract that constitutes a Lease, the assignee shall comply with the terms of each such Lease in its entirety (as may be modified in any written agreement between an assignee and the applicable contract counterparty), including (a) any accrued and unbilled rent, common area maintenance, insurance, taxes, or similar charges and any indemnification obligations that come due or are asserted on or after the effective date of the assumption and assignment of such assumed Lease regardless of whether such amounts relate to the period prior to or after the assignment date, and (b) any repair and maintenance obligations relating to the conditions at the premises subject to the assumed Lease that may exist as of the assignment date. Nothing in this Sale Order or the APA shall impair or prejudice an applicable landlord's rights with respect to the Debtors' available insurance coverage with respect to third-party claims asserted in connection with the Debtors' use and occupancy of the applicable premises subject to the assigned Lease with regard to events that occurred prior to the assignment date.

26.    Any postpetition amendments to Assumed Contracts entered into between one or more of the Debtors and the applicable counterparties, which the Purchaser elects to accept, are hereby approved and the relevant Assumed Contracts are deemed to include such amendments. Notwithstanding anything herein to the contrary, to the extent that any of the provisions of this Sale Order conflict with the provisions of any such amendments, the respective amendments shall govern.  Any postpetition amendments to Assumed Contracts entered into between one or more of the Debtors and the applicable counterparties, which the Purchaser elects not to accept, shall have no force or effect.

27.    Except for the Assumed Liabilities or as otherwise specifically set forth in paragraph 25 of this Sale Order, defaults or other obligations of the Debtors under the Assumed

Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) as to which no objections were filed and remain pending as of the date of this Sale Order are deemed satisfied by the payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under such Assumed Contract in those amounts set forth in the Cure Notice, which was served in compliance with the Bidding Procedures Order, and which were satisfied, or shall be satisfied as soon as practicable, as provided in the APA.

28.     For all Assumed Contracts for which a Cure Notice was served, the Debtors or the Purchaser, as applicable under the APA, are authorized and directed to pay all Cure Costs listed in the Cure Notice, or in an amount agreed to by the Assumed Contract counterparty, upon the later of (a) seven days after Closing, (b) the time agreed to by the Assumed Contract counterparty, or (c) for any Assumed Contract for which (i) a timely filed and served objection or (ii) both the Debtors' counsel and the Purchaser's counsel have agreed to accept an informal objection as an objection (an "Assumption Objection") to the assumption and assignment of such agreement or the Cure Costs relating thereto remains pending as of the date of this Sale Order, the resolution of such Assumption Objection by settlement or order of this Court.  If no out-of-court resolution can be reached, either party may request a hearing on no less than 14 days' notice to the other party.

29.     With respect to Assumed Contracts that constitute unexpired Leases (as defined in the APA), payment of the applicable Cure Cost designated in the Cure Notice or as otherwise agreed to by the Purchaser and the counterparty in writing shall constitute the cure of all defaults arising under the Lease that are required to be cured by section 365(b)(1)(A) of the Bankruptcy Code (after giving effect to section 365(b)(2) of the Bankruptcy Code).  For the avoidance of doubt and notwithstanding anything to the contrary herein, the Debtors shall remain liable for any

4883-2571-2118

additional obligations under the Leases that arise under section 365(d)(3) of the Bankruptcy Code between the date of the entry of this Sale Order and the Closing.

30.    All contract counterparties to the Assumed Contracts must cooperate with, and expeditiously execute and deliver on, any reasonable request of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale.

31.    Nothing herein shall impair or prejudice the counterparty's right to recover from the Debtors' available insurance coverage with respect to third-party claims asserted in connection with the Debtors' use and occupancy of the leased premises on account of events that occurred prior to the effective date of assumption and assignment of such Lease to the Purchaser.  Except as specifically set forth in paragraph 25 of this Sale Order, the Purchaser shall not have any liability or obligation, including any indemnification obligation to the counterparty in relation to or in connection with any default, action, liability or other cause of action under the Lease existing, arising, accruing or based upon events occurring prior to the Closing, whether asserted or not.

32.    Except as set forth in this Sale Order, the Purchaser's assumption of obligations and liabilities under the Leases shall be limited to obligations arising from and after the Closing Date and which relate to periods from and after the Closing Date.

33.    In accordance with the APA, the Purchaser may remove or add any executory contract or unexpired lease to or from the Contract and Cure Schedule at any time up to the Closing Date.  The counterparty, and its counsel if known, to any such added or removed contract or unexpired lease will be notified by written notice via electronic mail, if possible, or first-class or

overnight U.S. mail, postage prepaid, where electronic delivery is unavailable, no later than two (2) business days following such determination.

34.    Each counterparty to an Assumed Contract as to which no Assumption Objection remains pending as of the date of this Sale Order is hereby forever barred, estopped, and permanently enjoined from asserting against the Debtors, the Purchaser, or any of their affiliates (including any designees), or the property of any of them, any default, breach, claims of pecuniary losses existing as of the Closing or by reason of Closing, action, liability, or other cause of action existing as of the date of the Sale Hearing whether asserted or not, or, against the Purchaser or any of its affiliates (including any designees), any counterclaim, defense, setoff, or any other Claim asserted or assertable against the Debtors.  Each non-Debtor party to an Assumed Contract as to which no Assumption Objection remains pending as of the date of this Sale Order is hereby forever barred, estopped, and permanently enjoined from asserting any objection to the assumption and assignment of such non-Debtor party's Assumed Contract including that its consent is necessary for such assumption and assignment.

### Assigned Postpetition Contracts

35.    The Debtors are hereby authorized to and only upon consent of the applicable counterparty to an Assigned Postpetition Contract, shall, in accordance with sections 105(a) and 363 of the Bankruptcy Code, (a) assign the Assigned Postpetition Contracts to the Purchaser, effective upon and subject to the occurrence of the Closing, free and clear of all Liens (except for Permitted Liens), Claims, encumbrances, and other interests of any kind or nature whatsoever (other than Assumed Liabilities), and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Postpetition Contracts to the Purchaser.  The Purchaser's assumption of the Assigned Postpetition Contracts on the terms

31

set forth in the APA is hereby approved, and all requirements and conditions under section 363 of

the Bankruptcy Code for the assignment of the Assigned Postpetition Contracts by the Debtors to

the Purchaser have been satisfied.

36.    Upon assignment to the Purchaser, (a) the Assigned Postpetition Contracts shall

remain in full force and effect for the benefit of the Purchaser in accordance with their respective

terms; and (b) in accordance with section 363 of the Bankruptcy Code, the Purchaser shall be fully

and irrevocably vested in all right, title, and interest of the Debtors in each Assigned Postpetition

Contracts free and clear of Liens (except for Permitted Liens), Claims, encumbrances, and other

interests of any kind or nature whatsoever (other than Assumed Liabilities).

37.    Upon assignment to the Purchaser, the Purchaser is substituted for all purposes as

a party to all Assigned Postpetition Contracts in the place of any applicable Debtor or Debtors

party to any such Assigned Postpetition Contracts, and the Purchaser shall have any and all rights

and benefits of the respective Debtor or Debtors under all such Assigned Postpetition Contracts

without interruption or termination of any kind, and all terms applicable to such Debtor or Debtors

shall apply to the Purchaser as if such Assigned Postpetition Contracts were amended to replace

such Debtor or Debtors with the Purchaser.

## **Additional Provisions**

38.    The Purchaser shall not be deemed to be a joint employer, single employer, co-

employer, or successor employer with the Debtors for any purpose or under the laws of the United

States, any state, territory, or possession thereof, and the Purchaser shall not have any obligation

to pay any past wages, benefits, or severance pay or extend or make any benefits or benefit

programs, including the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar

4883-2571-2118

laws or regulations, to any of the Debtors' employees or former employees, including any such employees who may become employees of the Purchaser.

39.      Notwithstanding anything to the contrary in this Sale Order or the APA, the rights of insured persons and entities, if any, to access any insurance policies or the proceeds thereof (collectively, the "Policies") in their respective capacities as insureds thereunder, including those under which the Debtors are insured, shall not be affected or diminished by this Sale Order, and the rights, defenses and claims of the Debtors, their Estates, any representative of the Estates, and insurers are reserved with respect thereto; *provided* that nothing in the Sale Motion, APA, or this Sale Order alters or amends the terms and conditions of the Policies, enjoins insurers or relieves the Debtors or any insurers of any of their obligations thereunder.

40.      Notwithstanding anything to the contrary in the Motion, the APA, any lists of executory contracts to be assumed and assigned and/or any Cure Notices or supplemental Cure Notices, the Assumed Contract Schedule, this Order, or any documents relating to any of the foregoing: nothing shall permit or otherwise effect a sale, an assignment or any other transfer, without the express written consent of either the Zurich Companies[6] or the Chubb Companies,[7] as applicable, of (a) any insurance policies issued by the Zurich Companies to or that provide coverage to the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto (collectively, the "Zurich Insurance Contracts") or any insurance policies issued by the Chubb Companies to or that provide coverage to the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto (collectively, the "Chubb Insurance

---

[6] The "Zurich Companies" are defined, collectively, as Zurich American Insurance Company, American Zurich Insurance Company, American Guarantee & Liability Insurance Company and/or any of their affiliates and predecessors.

[7] The "Chubb Companies" are defined, collectively, as ACE American Insurance Company and Federal Insurance Company and each of their U.S.-based affiliates and predecessors.

4883-2571-2118

Contracts" and, together with the Zurich Insurance Contracts, the "Zurich/Chubb Insurance Contracts") and/or (b) (i) any rights, proceeds, benefits, interests, claims, rights to payments and/or recoveries under the Zurich/Chubb Insurance Contracts to the Successful Bidder; *provided*, *however*, that to the extent any claim with respect to the purchased Assets arises that is covered by the Zurich/Chubb Insurance Contracts, the Debtors may pursue such claim in accordance with the terms of the Zurich/Chubb Insurance Contracts, and, if applicable, turn over to the Successful Bidder any such insurance proceeds (each, a "Proceed Turnover"), *provided*, *further*, *however*, that the neither the Zurich Companies nor the Chubb Companies shall have any duty to effectuate a Proceed Turnover or liability related to a Proceed Turnover.

41.     Notwithstanding anything to the contrary in the Motion, the APA, this Sale Order, or any documents relating to any of the foregoing: (i) subject to a further Court order, Sysco Corporation, Edward Don & Company, and/or any of their respective affiliates and subsidiaries (collectively, "Sysco/DON") shall not be required to return the deposit they are holding in the collective amount of $560,000 (the "Deposit") to the Debtors or to transfer the Deposit to the Purchaser; (ii) Sysco/DON's rights in the Deposit shall not be affected or diminished by the Motion, the APA, this Sale Order, or any documents relating to any of the foregoing; and (iii) Sysco/DON, the Debtors, and the Purchaser retain all rights and arguments with respect to Sysco/DON's ability to apply the Deposit to any amounts owed to Sysco/DON, and to Sysco/DON's rights to assert offset with respect to the Deposit, in each case as if the Sale had not occurred.

42.     This Sale Order (a) shall be effective as a determination that, upon the Closing, all Liens (except for Permitted Liens), Claims, encumbrances, and other interests of any kind or nature whatsoever (other than Assumed Liabilities) existing as to the Purchased Assets, prior to the

4883-2571-2118

Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, foreign, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Purchased Assets, including the Purchased Actions.

43.     Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale transaction contemplated by the APA.

44.     To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing Date.

45.     Possession of any and all alcohol inventory shall be surrendered to the Purchaser at the earliest of (a) immediately following Closing where allowed by applicable law; (b) receipt by the Purchaser of authorization from the applicable Governmental Entity where required by applicable law; or (c) receipt by the Purchaser of the applicable liquor license; *provided* that possession of such inventory shall not be surrendered to the Purchaser if doing so would violate applicable law in each applicable jurisdiction.

46.    To the extent any license or permit necessary for the operation of the Business is not an assumable and assignable executory contract, the Purchaser shall make reasonable efforts to apply for and obtain any such license or permit promptly after the Closing Date, and the Debtors shall cooperate reasonably with the Purchaser in those efforts.  All existing licenses or permits, including the liquor licenses identified in the APA shall remain in place for the Purchaser's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures.

47.    With regard to the sale of alcohol at the premises subject to Assumed Contracts that constitute unexpired Leases, the Debtors and all other parties in interest shall cooperate fully with and support the Purchaser in executing such applications and furnishing such documents as are necessary for the Purchaser to obtain, in its name, a temporary new alcohol beverage license or transferred liquor license.  To the fullest extent allowed by applicable law, the Purchaser may continue to operate at such locations under existing ABC Licenses, state food service licenses, local occupational licenses, and any other licenses needed to operate at such premises, with no interruption of the business conducted at the premises, until the ABC Licenses and other licenses and permits have been transferred to the Purchaser, or new alcohol beverage licenses and other licenses and permits have been issued to the Purchaser.

48.    To the maximum extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any right, copyright, patent, trademark or other permission, permit or license, including liquor licenses, relating to the use or operation of the Purchased Assets, due to the filing or pendency of the Debtors' chapter 11 cases or the consummation of the Sale of the Purchased Assets.  Each and every federal, state, and local

governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale.

49.     At any time prior to the Closing, the Purchaser may assign the APA, portions thereof, and any or all of its rights thereunder, to one or more of its affiliates or subsidiaries, each of which shall be entitled to assume and accede to the APA and to purchase and acquire any or all of the Purchased Assets and assume any or all of the Assumed Liabilities in lieu of the Purchaser, and such affiliate(s) and designee(s) shall be deemed to be the Purchaser for all purposes under this Sale Order and shall be, jointly with Purchaser and each other, entitled to all rights and benefits conferred upon Purchaser pursuant to this Sale Order .

50.     Neither the Purchaser nor any of its affiliates, subsidiaries, or designees are or shall be deemed, as a result of the consummation of the Sale contemplated herein, to:  (a) be legal successors to the Debtors or their estates by reason of any theory of law or equity; (b) be an affiliate of any of the Debtors; (c) have, de facto or otherwise, merged with or into the Debtors; (d) be an alter ego or a mere continuation or substantial continuation or successor of the Debtors in any respect; or (e) be a joint employer or co-employer with, or successor employer, of the Debtors. Except as expressly provided for in the APA or this Sale Order, neither the Purchaser nor any of its affiliates or designees shall (y) assume or in any way be responsible for any Liens, Claims, encumbrances, or other interests of any kind or nature whatsoever against, or obligation of, any of the Debtors and/or their estates or (z) have any liability or responsibility for any Liens, Claims, encumbrances, or other interests of any kind or nature whatsoever against, or other obligation of, the Debtors' arising under or related to the Purchased Assets or otherwise.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APA, neither the Purchaser nor its affiliates or designees shall be liable for any Claims against the

4883-2571-2118

Debtors or any of their predecessors or affiliates, and neither the Purchaser nor its affiliates or designees shall have any successor or vicarious liabilities of any kind or character, including any theory of warranty, product liability, successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' Business prior to the Closing.

51.    Following Closing, no holder of a Lien (except for Permitted Liens), Claim, encumbrance, or other interest of any kind or nature whatsoever (other than Assumed Liabilities) in the Purchased Assets (including the Purchased Actions) shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to such Lien, Claim, encumbrance, or interest, or any actions that the Debtors may take in these chapter 11 cases or any successor cases.

52.    The Purchaser is a good faith purchaser and is hereby granted and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code to a good faith buyer, including with respect to the transfer of the Assumed Contracts and Assigned Postpetition Contracts as part of the Sale of the Purchased Assets.

53.    Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Sale Order are hereafter reversed, modified, or vacated by a subsequent order of the Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of any transfer under the APA or obligation or right granted pursuant to the terms of this Sale Order (unless stayed pending appeal), and, notwithstanding any reversal, modification,

or vacatur, the validity and enforceability of any transfer under the APA or obligation or right

granted pursuant to the terms of this Sale Order shall be governed in all respects by the original

provisions of this Sale Order and the APA, as applicable.

54.     The so-called "bulk sale" laws or any similar law of any applicable state or other

jurisdiction are waived or inapplicable to the Sale.

55.     Except as otherwise expressly provided in the APA, the Purchaser shall have no

liability to pay wages, bonuses, severance pay, benefits (including contributions or payments on

account of any under-funding with respect to any and all pension plans), or any other payment

with respect to employees or former employees of the Debtors.  Except as otherwise expressly

provided in the APA, the Purchaser shall have no liability with respect to any collective bargaining

agreement, employee pension plan, employee welfare or retention, benefit, and/or incentive plan

to which any Debtor is a party and relating to the Purchased Assets (including arising from or

related to the rejection or other termination of any such agreement), and the Purchaser shall in no

way be deemed a party to or assignee of any such agreement, and no employee of the Purchaser

shall be deemed in any way covered by or a party to any such agreement, and except as otherwise

expressly provided in the APA, all parties to any such agreement are hereby enjoined from

asserting against the Purchaser any and all Claims arising from or relating to the APA.

56.     The failure to specifically include any particular provisions of the APA or any of

the documents, agreements, or instruments executed in connection therewith in this Sale Order

shall not diminish or impair the effectiveness or force of such provision, document, agreement, or

instrument, it being the intent of the Court, the Debtors, and the Purchaser, that the APA and each

provision, document, agreement, and instrument be authorized and approved in its entirety with

such amendments thereto as may be made in conformity with this Sale Order prior to the Closing
Date.

57.     To the extent of any conflict between the APA and this Sale Order, the terms and
provisions of this Sale Order shall govern.

58.     Nothing contained in any chapter 11 plan confirmed in these chapter 11 cases, the
order confirming any chapter 11 plan, or any order in these chapter 11 cases (including any order
approving a wind-down or dismissal of these chapter 11 cases or any order entered as part of or
after any conversion of the these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code)
shall alter, conflict with, or derogate from the provisions of the APA or this Sale Order, and to the
extent of any conflict or derogation between this Sale Order or the APA and such future chapter 11
plan or order, the terms of this Sale Order and the APA shall control.

59.     The Purchaser shall reasonably cooperate with the Debtors, the Committee, and any
liquidating trustee appointed under a chapter 11 plan by providing reasonable access to documents
and information purchased and/or controlled by the Purchaser as reasonably necessary to facilitate
a wind-down of the estates, confirmation of a chapter 11 plan, distribution to creditors,
reconciliation of claims, or other function as reasonably requested by the Debtors, the Committee,
or any liquidating trustee; *provided*, *however*, that nothing in this paragraph requires the Purchaser
to cooperate with the Committee or any liquidating trustee pursuant to this paragraph unless such
party provides reasonable compensation to the Purchaser for the work necessary to comply with
this paragraph (including for the time spent by the Purchaser's employees and outside
professionals).

60.     This Court shall retain exclusive jurisdiction to enforce the terms and provisions of
the APA and each of the agreements executed in connection therewith, this Sale Order, and the

Bidding Procedures Order in all respects and to decide any disputes concerning this Sale Order and the APA, or the rights and duties all Entities hereunder or thereunder, as applicable, or any issues relating to this Sale Order or the APA, including the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Purchased Assets and any Assumed Contracts or Assigned Postpetition Contracts, and all issues and disputes existing in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever.

61.    Notwithstanding anything to the contrary herein, nothing contained in this Sale Order shall affect, alter, or impair the rights and remedies or defenses of the Debtors, their estates, or the Purchaser with regard to (i) the APA, including with respect to any purported breach of the APA, or (ii) any purported breach of this Sale Order.

62.    Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any entity obtaining a stay pending appeal, the Debtors and the Purchaser are free to close the Sale under the APA in accordance with its terms at any time.

# # # END OF ORDER # # #

4883-2571-2118

Submitted by:

Jason S. Brookner (TX Bar No. 24033684)
Amber M. Carson (TX Bar No. 24075610)
Emily F. Shanks (TX Bar No. 24110350)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:        jbrookner@grayreed.com
                 acarson@grayreed.com
                 eshanks@grayreed.com

*Counsel to the Debtors*
*and Debtors in Possession*

4883-2571-2118

**Exhibit 1**

**APA**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**by and among**

**BUCA C, LLC,**
**BUCA TEXAS RESTAURANTS, L.P.,**
**BUCA TEXAS BEVERAGE, INC.,**
**BUCA SALES & MARKETING, LLC,**
**BUCA INVESTMENTS, INC.,**
**BUCA RESTAURANTS, INC.,**
**BUCA RESTAURANTS 2, INC.,**
**BUCA (CELEBRATION), LLC,**
**BUCA (EX), LLC,**
and
**BUCA (MINNEAPOLIS), INC.**

**and**

**BDB INTERMEDIATE, LLC**

**October 31, 2024**

# TABLE OF CONTENTS

**ARTICLE I.** DEFINITIONS .................................................................................... 5

**ARTICLE II.** PURCHASE AND SALE ................................................................ 16

Section 2.1    Purchase and Sale of Purchased Assets .......................................... 16
Section 2.2    Excluded Assets ............................................................................... 19
Section 2.3    Assumption of Assumed Liabilities ................................................. 20
Section 2.4    Excluded Liabilities ......................................................................... 21
Section 2.5    Consideration ................................................................................... 21
Section 2.6    Assignment and Assumption of Contracts; Excluded Locations ..... 22
Section 2.7    Closing ............................................................................................. 24
Section 2.8    Deliveries at Closing ....................................................................... 24
Section 2.9    Allocation ........................................................................................ 26

**ARTICLE III.** SELLERS' REPRESENTATIONS AND WARRANTIES ............. 26

Section 3.1    Organization of Sellers; Good Standing .......................................... 26
Section 3.2    Authorization of Transaction ........................................................... 27
Section 3.3    Noncontravention ............................................................................ 27
Section 3.4    Compliance with Laws ..................................................................... 27
Section 3.5    Title to Purchased Assets ................................................................ 28
Section 3.6    Contracts .......................................................................................... 28
Section 3.7    Intellectual Property ........................................................................ 29
Section 3.8    Litigation .......................................................................................... 30
Section 3.9    Employees and Employment Matters ............................................... 30
Section 3.10   Employee Benefit Plans ................................................................... 31
Section 3.11   Real Property .................................................................................... 32
Section 3.12   Permits ............................................................................................. 32
Section 3.13   Environmental .................................................................................. 33
Section 3.14   Taxes ................................................................................................ 33
Section 3.15   Brokers' Fees .................................................................................... 34
Section 3.16   No Other Representations or Warranties .......................................... 34

**ARTICLE IV.** BUYER'S REPRESENTATIONS AND WARRANTIES ................ 35

Section 4.1    Organization of Buyer ...................................................................... 35
Section 4.2    Authorization of Transaction ........................................................... 35
Section 4.3    Noncontravention ............................................................................ 35
Section 4.4    Financial Capacity ........................................................................... 36
Section 4.5    Adequate Assurances Regarding Executory Contracts ..................... 36
Section 4.6    Good Faith Purchaser ...................................................................... 36
Section 4.7    Brokers' Fees .................................................................................... 36
Section 4.8    Condition of Business ...................................................................... 36

**ARTICLE V.** PRE-CLOSING COVENANTS ...................................................... 37

Section 5.1    Certain Efforts; Cooperation ........................................................... 37
Section 5.2    Notices and Consents ....................................................................... 37
Section 5.3    Bankruptcy Actions .......................................................................... 39

i

Section 5.4     Conduct of Business ............................................................ 40
Section 5.5     Certain Restricted Conduct ................................................... 42
Section 5.6     Notice of Developments ....................................................... 43
Section 5.7     Access ................................................................................. 43
Section 5.8     Press Releases and Public Announcements ........................... 43
Section 5.9     Bulk Transfer Laws .............................................................. 44
Section 5.10    Contracts ............................................................................. 44
Section 5.11    Casualty, Condemnation, Loss of Lease ................................ 44

**ARTICLE VI.** OTHER COVENANTS ........................................................... 45

Section 6.1     Cooperation ......................................................................... 45
Section 6.2     Further Assurances .............................................................. 45
Section 6.3     Availability of Business Records .......................................... 46
Section 6.4     Employee Matters ................................................................ 46
Section 6.5     Recording of Intellectual Property Assignments ................... 49
Section 6.6     Transfer Taxes ..................................................................... 49
Section 6.7     Wage Reporting ................................................................... 49
Section 6.8     Collection of Accounts Receivable ....................................... 49
Section 6.9     Use of Name and Marks ....................................................... 50
Section 6.10    Liquor License Approvals .................................................... 50
Section 6.11    Data Privacy Protection ....................................................... 51

**ARTICLE VII.** CONDITIONS TO CLOSING ............................................... 52

Section 7.1     Conditions to Buyer's Obligations ........................................ 52
Section 7.2     Conditions to Sellers' Obligations ........................................ 52
Section 7.3     No Frustration of Closing Conditions .................................... 53

**ARTICLE VIII.** TERMINATION ................................................................. 53

Section 8.1     Termination of Agreement .................................................... 53
Section 8.2     Procedure Upon Termination ................................................ 55
Section 8.3     Effect of Termination ........................................................... 55

**ARTICLE IX.** MISCELLANEOUS ............................................................... 55

Section 9.1     Remedies ............................................................................. 55
Section 9.2     Expenses ............................................................................. 56
Section 9.3     Entire Agreement ................................................................. 56
Section 9.4     Incorporation of Schedules, Exhibits and Disclosure Schedule ....... 56
Section 9.5     Amendments and Waivers ..................................................... 56
Section 9.6     Succession and Assignment .................................................. 57
Section 9.7     Notices ................................................................................ 57
Section 9.8     Governing Law; Jurisdiction ................................................ 58
Section 9.9     Consent to Service of Process .............................................. 58
Section 9.10    WAIVERS OF JURY TRIAL ............................................... 58
Section 9.11    Severability .......................................................................... 58
Section 9.12    No Third Party Beneficiaries ................................................ 59
Section 9.13    No Survival of Representations, Warranties and Agreements ........ 59
Section 9.14    Construction ........................................................................ 59

ii

Section 9.15   Computation of Time ........................................................................ 59
Section 9.16   Mutual Drafting .............................................................................. 59
Section 9.17   Disclosure Schedule ......................................................................... 60
Section 9.18   Headings; Table of Contents ............................................................... 60
Section 9.19   Counterparts; Facsimile and Email Signatures ............................................. 60
Section 9.20   Time of Essence .............................................................................. 60

iii

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (as amended or modified, this "Agreement") is entered into as of October 31, 2024 (the "Execution Date"), by and among BUCA C, LLC, a Florida limited liability company ("Parent"), BUCA Texas Restaurants, L.P., a Texas limited partnership ("Texas Restaurants"), BUCA Texas Beverage, Inc., a Texas corporation ("Beverage"), BUCA Sales & Marketing, LLC, a Florida limited liability company ("Marketing"), BUCA Investments, Inc., a Minnesota corporation ("Investments"), BUCA Restaurants, Inc., a Minnesota corporation ("Minnesota Restaurants"), BUCA Restaurants 2, Inc., a Minnesota corporation ("Minnesota Restaurants Two"), BUCA (CELEBRATION), LLC, a Florida limited liability company ("Celebration"), BUCA (EX), LLC, a Florida limited liability company ("Ex"), and BUCA (Minneapolis), Inc., a Minnesota corporation ("Minneapolis" and, together with Parent, Texas Restaurants, Beverage, Marketing, Investments, Minnesota Restaurants, Minnesota Restaurants Two, Celebration, and Ex, "Sellers", and each are individually a "Seller"), and BDB Intermediate, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer").   Sellers and Buyer are referred to herein collectively as the "Parties". Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in ARTICLE I.

## RECITALS

WHEREAS, Sellers are engaged in the business of owning, operating and franchising a chain of family-style Italian-American restaurants under the trade name of "Buca di Beppo" in fourteen (14) states and two international locations (collectively, the "Business");

WHEREAS, Sellers were previously, but are no longer, Controlled (as defined herein) by BUCA, LLC, a Minnesota limited liability company ("BUCA PHI");

WHEREAS, Sellers have each commenced proceedings (collectively, the "Chapter 11 Cases") under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, subject to approval of the Bankruptcy Court and on the terms and subject to the conditions set forth herein and pursuant to an anticipated Sale Order and Sale Procedures Order, Sellers wish to sell, transfer and assign to Buyer or one or more of its Permitted Designees (as defined below), and Buyer wishes to purchase, acquire and assume from Sellers, pursuant to Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities as of the Closing;

WHEREAS, on the Closing Date, Buyer will acquire certain assets and assume certain liabilities of the Business of Sellers in accordance with the terms of this Agreement;

WHEREAS, in accordance with this Agreement, on or before the Closing Date, Buyer intends to form a series of Affiliated limited liability companies, each of which will be an assignee of certain of the Purchased Assets (the "Permitted Designees");

4

WHEREAS, Sellers intend to seek the entry of an order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order; and

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

## AGREEMENT

## ARTICLE I.
## DEFINITIONS

"Accounts Receivable" means (a) all accounts, accounts receivable, Credit Card Receivables, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing, but excluding any Accounts Receivable related to Ecolab Inc.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person, including those Persons defined and described as an Affiliate or Insider in the Bankruptcy Code.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers, pursuant to the Sale Procedures Order, (a) accept a Qualified Bid other than that of Buyer, as the highest and best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a Plan or refinancing, all or substantially all of the Purchased Assets or the equity interests of any Seller (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer.

"Assigned Contracts" means the Assigned Prepetition Contracts and the Assigned Postpetition Contracts.

"Assigned Prepetition Contracts" has the meaning set forth in Section 2.6(b).

"Assigned Postpetition Contracts" has the meaning set forth in Section 2.6(c)(iii).

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(a)(ii).

"Assumed Contracts" has the meaning set forth in Section 2.6(a)(ii).

5

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms, but excluding all Permits to the extent related to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bill of Sale" has the meaning set forth in Section 2.8(a)(i).

"BUCA PHI" has the meaning set forth in the recitals.

"BUCA PHI Customer Programs" means those certain customer gift card program(s) offered and managed by BUCA PHI or its Affiliates (other than Sellers) on behalf of certain restaurant businesses, including the Business owned and conducted by Sellers, referred to collectively as the "Taste of Italy Program".

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in Houston, Texas shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Cash" means all cash and cash equivalents of Sellers as of the Closing.

"Casualty" has the meaning set forth in Section 5.11(b).

"Casualty Proceeds" has the meaning set forth in Section 5.11(b).

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Claim" or "claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"Closing Payment" means the Cure Costs that Buyer shall pay at Closing in accordance with the terms of this Agreement.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Law.

"Committee" means the Official Unsecured Creditors' Committee appointed in the Chapter 11 Cases.

6

"<u>Condemnation</u>" has the meaning set forth in <u>Section 5.11(a)</u>.

"<u>Condemnation Proceeds</u>" has the meaning set forth in <u>Section 5.11(a)</u>.

"<u>Consent</u>" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"<u>Contemplated Transactions</u>" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets.

"<u>Continuing Restaurant</u>" means any of Sellers' restaurant locations with respect to which the associated Leases are Assigned Contracts.

"<u>Contract</u>" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement, collective bargaining agreement, or other arrangement, understanding, permission or commitment that, in each case, is legally binding.

"<u>Contract and Cure Schedule</u>" has the meaning set forth in <u>Section 2.6(a)(i)</u>.

"<u>Control</u>" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "<u>Controlling</u>" and "<u>Controlled</u>" shall have meanings correlative to the foregoing.

"<u>Credit Bid</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Credit Card Receivables</u>" means all accounts receivable and other amounts owed to Sellers (whether current or non-current) in connection with any customer purchases from any Continuing Restaurants operated by Sellers that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers, including all Credit Card Receivables generated with respect to sales occurring during the three days immediately prior to the Closing Date, including any amounts received by or payable to Sellers with respect to such sales occurring during such three days immediately prior to the Closing Date.

"<u>Cure Costs</u>" means, for only the Assumed Contracts, all amounts that are determined by a final and nonappealable order of the Bankruptcy Court must be paid, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to Buyer as provided herein.

"<u>Current Employees</u>" means all employees of Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

7

"<u>Debtors</u>" means Sellers, as debtors and debtors in possession in the Chapter 11 Cases.

"<u>Decree</u>" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"<u>Deposits</u>" has the meaning set forth in <u>Section 2.1(g)</u>.

"<u>DIP Credit Agreement</u>" shall have the same meaning given such term in the DIP Order.

"<u>DIP Lenders</u>" shall have the same meaning given such term in the DIP Order.

"<u>DIP Obligations</u>" means all "DIP Obligations" as defined in the DIP Order.

"<u>DIP Order</u>" means (a) the interim order entered by the Bankruptcy Court on or about August 7, 2024, approving the DIP Credit Agreement (Docket No. 77, the "<u>Interim Order</u>"); and (ii) the order of the Bankruptcy Court approving the DIP Credit Agreement on a final basis on or about August 30, 2024 (Docket No. 206, the "<u>Final Order</u>").

"<u>Disclosure Schedule</u>" has the meaning set forth in <u>ARTICLE III</u>.

"<u>Employee Benefit Plan</u>" means any (a) "employee benefit plans" (as defined in Section 3(3) of ERISA) and any bonus, stock option, stock purchase, restricted stock, equity based, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance, change in control or other benefit plans, programs or arrangements, and all employment, termination, severance, any cafeteria plan or any holiday or vacation plan or practice or other contracts or agreements, to which any Seller or any Seller's ERISA Affiliates is a party, with respect to which any Sellers or any Seller's ERISA Affiliates has any obligation to or which are maintained, contributed to or sponsored by any Seller or any Seller's ERISA Affiliates for the benefit of any Current Employee or Former Employee, officer, manager or director of any Seller, (b) employee benefit plan, policy or program for which any Seller or any Sellers' ERISA Affiliates could have any liability.

"<u>Employee Transfer Date</u>" has the meaning set forth in <u>Section 6.4(a)</u>.

"<u>ERISA</u>" means the United States Employee Retirement Income Security Act of 1974.

"<u>ERISA Affiliate</u>" of any entity means any other entity which, together with such entity, would be treated as a single employer under Section 414 of the Internal Revenue Code or Section 4001 or ERISA.

"<u>Excalibur Funds</u>" means (a) the Western UNITE HERE and Employers Pension Fund established pursuant to that certain Agreement and Declaration of Trust dated as of October 26, 2023, among the Sacramento Independent Hotel, Restaurant and Tavern Employees Pension Trust, the San Diego UNITE-HERE Pension Fund, the San Francisco Culinary Bartenders and Service Employees Pension Trust Fund, the Southern Nevada Culinary and Bartenders Pension Trust, and the UNITE HERE Northwest Pension Trust Fund, as successor by merger to, among others, the Southern Nevada Culinary and Bartenders Pension Trust established pursuant to that certain

8

Agreement and Declaration of Trust dated as of December 2, 1971, as amended, between the Nevada Resort Association (or its successor) and the Unions, (b) UNITE HERE HEALTH established pursuant to the Seventh Amended and Restated Declaration of Trust dated as of October 18, 2012, among the Employer Trustees party thereto, (c) the Southern Nevada Joint Management and Culinary and Bartenders Training Fund established pursuant to that certain Restated and Amended Declaration of Trust dated as of July 1993, between the Employers party thereto under the terms of the applicable Collective Bargaining Agreements, and the Local Joint Executive Board of Las Vegas (Culinary Workers Union, Local 226 and Bartenders Union, Local 165), (d) the Culinary and Bartenders Housing Partnership established pursuant to that certain Declaration of Trust dated as of July 23, 2008, between the Employers party thereto under the terms of the applicable Collective Bargaining Agreements, and the Local Joint Executive Board of Las Vegas (Culinary Workers Union, Local 226 and Bartenders Union, Local 165), and (e) the Culinary and Bartenders Legal Service Fund established pursuant to that certain Declaration of Trust dated as of July 1, 2019, between the Employers party thereto under the terms of the applicable Collective Bargaining Agreements, and the Local Joint Executive Board of Las Vegas (Culinary Workers Union, Local 226 and Bartenders Union, Local 165).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Claims" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of each Debtor and its bankruptcy estate (a) arising under Chapter 5 of the Bankruptcy Code or under any applicable state Law providing for the avoidance and recovery of preferential transfers or fraudulent claims, or both, against any party (other than those causes of action, lawsuits, claims, rights of recovery and other similar rights of each Debtor that are included in the definition of "Purchased Actions"), including all claims and causes of action of the Debtors arising under Sections 544 to 550 of the Bankruptcy Code, (b) against any current or former officer, member, manager, or director of any of the Debtors or any Affiliate or Subsidiary of any of the Debtors (including those causes of action, lawsuits, claims, rights of recovery and other similar rights of each Debtor and its bankruptcy estate arising under the PHI MSA), or (c) to the extent related to any Excluded Asset or Excluded Liability.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Restaurants" means any of Sellers' restaurant locations that are not Continuing Restaurants.

"Former Employees" means all individuals who have been employed by Sellers who are not Current Employees.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Health Plans" means all health plans of Sellers including, but not limited to, health, dental, life, disability and long-term care insurance.

9

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other form of insurance owned or held by or on behalf of Sellers and their operations, properties and assets, or providing insurance coverage to the Business.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world (including, without limitation, all common-law rights, statutory rights and contractual rights related to the following), including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith, (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing, (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof, (d) trade secrets and Recipes and menus, and (e) all other intellectual property rights related to the Business, including all social media accounts related to the Business.

"Intellectual Property Assignments" has the meaning set forth in Section 2.8(a)(iii).

"Inventory" means all of Sellers' consumable food, alcoholic beverages, and other beverages and raw materials and work-in-process therefor and all of Sellers' tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or Decree of any Governmental Entity.

"Leased Real Property" means all leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of Sellers which is used in the Business.

"Leases" means all leases, subleases, unexpired leases, unexpired subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Liability" means all indebtedness, losses, claims, damages, expenses, fines or other penalties, costs, royalties, proceedings, deficiencies, duties, obligations, and other liabilities

10

(including those arising out of any Litigation, such as any settlement or compromise thereof or judgment or award therein) of a Person (whether absolute, accrued, contingent, fixed, liquidated or unliquidated, or otherwise, and whether known or unknown, and whether due or to become due, and whether in contract, tort, strict liability, or otherwise, and whether or not resulting from third-party claims).

"<u>Lien</u>" means any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien (statutory or otherwise, including PACA/PASA Claims), encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"<u>Liquor License Approvals</u>" has the meaning set forth in <u>Section 6.10(a)</u>.

"<u>Liquor Licenses</u>" has the meaning set forth in <u>Section 3.12(b)</u>.

"<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"<u>Main Street Obligations</u>" means, individually or collectively, the DIP Obligations under the DIP Credit Agreement and the Prepetition Obligations under the Prepetition Loan Agreement.

"<u>Management Agreement</u>" means an agreement in the form as shall be reasonably acceptable to Buyer and Sellers, and which provides that all costs of operations of the Purchased Assets from and after the Closing Date shall be paid on a current basis by Buyer and the economic benefit of the operations of the Purchased Assets accrues to Buyer.

"<u>Material Adverse Effect</u>" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that has or could reasonably be expected to have a materially adverse effect on (a) the condition (financial or otherwise), business, properties, assets or results of operations of Sellers, the Business, or the Purchased Assets, in each case taken as a whole, (b) the ability of Sellers or the Debtors, as applicable, to conduct the Business consistent with recent history, or (c) the ability of Sellers or the Debtors, as applicable, to perform their obligations under this Agreement and the Related Agreements in material compliance with the requirements thereof or to consummate the Contemplated Transactions, but excluding (i) any change or effect to the extent that it results from or arises out of (A) the consequences of the filing of the Chapter 11 Cases and the impact thereof on the condition (financial or otherwise), business, properties, assets, or results of operations of Sellers, the Business or the Purchased Assets, (B) the execution and delivery of this Agreement or the announcement thereof or consummation of the Contemplated Transactions, (C) changes in (or proposals to change) Law, generally accepted accounting principles, or other accounting regulations or principles, or (D) any action contemplated by this Agreement or taken at the request of Buyer, (ii) any change or effect generally applicable to economic or political conditions or the

11

securities or financial markets in any country or region, (iii) any outbreak or escalation of hostilities or war or any act of terrorism, or (iv) any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded), in the case of clauses (ii) through (iv), which do not disproportionately affect Sellers relative to other industry participants.

"Material Contracts" has the meaning set forth in Section 3.6.

"Offeree" has the meaning set forth in Section 6.4(a).

"Ordinary Course of Business" means the ordinary course of business of Sellers consistent with past custom and practice and subject to any modifications of such practice as a result of the filing of the Chapter 11 Cases.

"PACA/PASA Claims" means any valid claims against Sellers under the Perishable Agricultural Commodities Act of 1930 or any similar state statutes of similar effect or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181, *et seq*. timely filed and served pursuant to an order of the Bankruptcy Court issued in the Chapter 11 Cases.

"Parties" has the meaning set forth in the preamble.

"PEO" means any professional employer organization, which is not an Affiliate of Sellers and not an Affiliate of BUCA PHI, that employs or directly engages certain Current Employees.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means: (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings, with any such contests and the amounts at issue with respect thereto described on Schedule PL, (b) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assigned Contract, (c) mechanics Liens and similar Liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business or otherwise approved by the Bankruptcy Court for amounts which are not delinquent or which are being contested in good faith by appropriate proceedings in an aggregate amount not to exceed $50,000, (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted, and (e) with respect to Leases that constitute Assigned Contracts for each Continuing Restaurant, easements, covenants, conditions, restrictions and other similar matters affecting such real property and other encroachments that do not or would not materially

12

impair the use or occupancy of such real property or materially interfere with the operation of the Business at such real property.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" means the date of the filing of the Chapter 11 Cases.

"PHI MSA" means the Accounting, Management and Administrative Services Agreement dated as of June 30, 2014, between Parent and PB Restaurants, LLC, a Delaware limited liability company f/k/a Planet Hollywood International, Inc., as amended, modified or supplemented from time to time.

"PII" has the meaning set forth in Section 6.11.

"Plan" means a plan of reorganization or liquidation proposed by Sellers and/or any party in interest.

"Postpetition Contract Assignment Agreement" has the meaning set forth in Section 2.8(a)(vii).

"Postpetition Contract Schedule" has the meaning set forth in Section 2.6(c)(i).

"Postpetition Contracts" means all Contracts to which any Seller is a party that were entered into on or after the Petition Date, excluding modifications or amendments to any Prepetition Contracts entered into on or after the Petition Date.

"Prepetition Contracts" means all Contracts to which any Seller is a party that were entered into prior to the Petition Date, including modifications or amendments to any such Contracts entered into on or after the Petition Date.

"Prepetition Loan Agreement" has the meaning given such term in the DIP Order.

"Prepetition Obligations" has the meaning given such term in the DIP Order.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Actions" means all causes of action, lawsuits, claims, rights of recovery of each Debtor and its bankruptcy estate that are not Excluded Claims, including those (a) arising under any Assigned Contract, (b) against any current vendor of the Business for goods or services provided or performed on, prior to, or after the Petition Date with respect to Continuing Restaurants, including those of each Debtor and its bankruptcy estate arising under Chapter 5 of the Bankruptcy Code or under any applicable state Law against any such vendor, or (c) arising under any Seller Customer Program.

13

"Purchased Assets" has the meaning set forth in Section 2.1; provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Purchased Assets shall not include any Excluded Assets.

"Qualified Bid" means competing qualified bids in accordance with the Sale Procedures Order.

"Qualified Bidder" has the meaning set forth in Sale Procedures Order.

"Recipes" has the meaning set forth in Section 2.1(g).

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Rejected Contracts" has the meaning set forth in Section 2.6(a)(ii).

"Related Agreements" means the Management Agreement(s), if necessary, the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignments, the Transition Services Agreement, and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Hearing" means the hearing scheduled with the Bankruptcy Court to consider the sale portion of the Sale Motion.

"Sale Motion" means a motion filed by Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Procedures Order and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases approving the sale to Buyer consistent with the terms of this Agreement and otherwise acceptable to Buyer and Sellers.

"Sale Order Deadline" means November 4, 2024.

"Sale Procedures" means the procedures approved pursuant to the Sale Procedures Order, and satisfactory, in form and substance, to Buyer in its reasonable discretion.

"Sale Procedures Order" means an order of the Bankruptcy Court, entered at Docket No. 177, that, among other things, (a) establishes a date for the Sale Hearing, and (b) establishes

14

procedures for the bidding process, including: (i) the receipt by Sellers of a qualified bid by the applicable bid deadline, (ii) the amount of the cash bid required for a qualified bid, (iii) the nature of the financial information that potential bidders must submit to consummate a qualified bid, (iv) the requirement that for a qualified bid a duly authorized and fully executed purchase agreement must be included, with terms that are substantially the same as, not more burdensome in any material way than, and no more conditional than, the terms of Buyer's proposed transaction under the terms of this Agreement, and (v) the nature of the information that potential bidders must submit to demonstrate their ability to provide adequate assurance of future performance with respect to potential Contracts and Leases that may be assumed and assigned.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Customer Programs" means those certain customer gift card programs offered and managed by Sellers with respect to the Business.

"Seller Transaction Expenses" means the collective amounts payable by Sellers (or for which any Seller could become liable to pay) for all out-of-pocket fees and expenses incurred in connection with the preparation, negotiation, execution and consummation of the Contemplated Transactions, including any (a) "Sale Transaction Fee" owing to Stout Capital, LLC under and as defined in that certain Letter Agreement between Stout Capital, LLC and Parent, dated as of July 30, 2024, and (b) "Lease Transaction Fee" owing to Gordon Brothers Realty Services, LLC under and as defined in that certain Real Estate Consulting and Advisory Services Agreement, between Gordon Brothers Realty Services, LLC and Parent, dated effective as of August 12, 2024.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge (after good faith inquiry of current employees of Sellers and employees of BUCA PHI and its Affiliates, in each case primarily responsible for the subject matter in question) of William Snyder and Soegiono Hadiwijaya.

"Specified Accounts" has the meaning in the definition of Accounts Receivable set forth above.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. A Person or Persons own a majority ownership interest in a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all direct or indirect Subsidiaries of such Person, but with respect to Sellers, shall not include Restaurant Opportunities, LLC, a Florida limited liability company.

15

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.6.

"Transferred Employee" has the meaning set forth in Section 6.4(a).

"Transition Services Agreement" means an agreement in the form attached hereto as Exhibit G and which provides for the performance by Sellers for the benefit of Buyer and its Permitted Designees of certain transition services with respect to the Business following the Closing.

"Unions" means, collectively, Culinary Workers Union, Local 226 and Bartenders Union, Local 165.

"WARN" has the meaning set forth Section 5.4(f).

## ARTICLE II.
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets**.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Sellers, on an "as is, where is" basis (except with respect to the representations and warranties made in ARTICLE III) and without any representation or warranty on the part of Sellers as to fitness, merchantability, or otherwise, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of Sellers' rights, title and interests in and to tangible and intangible real and personal property assets used or held for use by Sellers in the operation of the Business (the "Purchased Assets"), free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), for the consideration specified in Section 2.5.  Without limiting the generality of the foregoing, the Purchased Assets shall include, without limitation, the following (except to the extent it is included in the definition of Excluded Assets):

(a)    all Accounts Receivable of Sellers for all Continuing Restaurants as of the Closing;

(b)    all Credit Card Receivables for all Continuing Restaurants;

16

(c)      all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing, but excluding: (i) alcoholic beverage Inventory in jurisdictions where the Law does not permit Buyer to take title to such Inventory through an asset purchase arrangement, (ii) alcoholic beverage Inventory in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals from the pertinent Governmental Entity; provided, however, Sellers shall transfer, assign, convey and deliver to Buyer such alcoholic beverage Inventories in each instance upon issuance of the relevant Liquor License Approval or other authorization from the Bankruptcy Court or relevant Governmental Entity, and (iii) Inventory located at a restaurant that is covered by a Lease that does not constitute an Assigned Contract;

(d)      (i) all deposits under the Leases at each Continuing Restaurant, (ii) all deposits under all Assigned Contracts that are not Leases, and (iii) other prepaid deposits (including those made to Sysco Corporation or its Affiliates by or on behalf of Sellers), charges and expenses of Sellers with respect to each Continuing Restaurant, including, but not limited to, all deposits for electricity, telephone, cable television, internet, Wi-Fi services, satellite television and other utilities (collectively, "Deposits");

(e)      to the maximum extent permitted by the Bankruptcy Code, all Assigned Contracts, the rights and benefits accruing thereunder, and all documents related thereto;

(f)      all Intellectual Property owned by Sellers;

(g)      all of Sellers' recipes, methods, procedures, cooking/preparation/mixing publications, guidelines, or standards, knowhow, ingredient lists, menus, price lists, nutritional, health, or dietary information, publications, or disclosures, and promotional or informational materials, in each case whether related to food, beverages (whether alcoholic or non-alcoholic), or otherwise (in each case, written or oral or in any other form whatsoever) (collectively, "Recipes");

(h)      all open purchase orders with suppliers related to the Continuing Restaurants;

(i)      all tangible personal property, including all machinery, equipment, tools, point of sale systems, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, cutlery, office supplies, production supplies, pots, pans, kitchen equipment, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers (including any of the foregoing property that is subject to a personal property lease, but only to the extent that Buyer assumes such lease as an Assigned Contract), other than tangible personal property located at a restaurant that is covered by a Lease that does not constitute an Assigned Contract;

(j)      all rights under leases for all cars, trucks, or other motor vehicles set forth on Schedule 2.1(j);

17

(k)    all Records, including Records related to Taxes paid or payable by any Seller related to the Continuing Restaurants (provided that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Debtors upon reasonable request and at such Debtor's expense);

(l)    all goodwill associated with the Business and the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any Seller to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(m)    all rights of Sellers under non-disclosure or confidentiality, noninterference, inventions assignment, non-compete, or non-solicitation agreements with current or former employees, directors, consultants, independent contractors and agents of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(n)    all of the Assumed Permits or all of the rights and benefits accruing under any Permits relating to the Continuing Restaurants, including all Liquor Licenses to the extent transferrable and held by Sellers, other than alcohol permits (including Liquor Licenses) in jurisdictions where the Law does not permit Buyer to take title to such Permits until it obtains the requisite approvals from the pertinent Governmental Entity, in which case Sellers shall transfer, assign convey and deliver to Buyer such Permits, in each instance upon issuance of the requisite approvals from the relevant Governmental Entity;

(o)    the amount of, and all rights to any, insurance proceeds received by any of Sellers after the Execution Date in respect of (i) the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(p)    the Purchased Actions;

(q)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers, to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(r)    the right to receive and retain mail relating to Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing, in each case relating to the Continuing Restaurants;

(s)    all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names owned by Sellers or otherwise utilized by Sellers in conducting the Business;

(t)    all assets, rights and claims arising from or with respect to Taxes of any Seller, including all rights arising from any refunds due from federal, state and/or local

18

Governmental Entities with respect to Taxes paid by Sellers, all deferred tax assets, Tax deposits, Tax prepayments and estimated Tax payments;

(u)      the Excalibur Funds;

(v)      all rights, interests or claims with respect to or arising under any Seller Customer Program; and

(w)      all other assets that are related to or used in connection with the Business (but excluding all of the Excluded Assets).

**Section 2.2      Excluded Assets**.  Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Seller is not selling or assigning, any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)      all Cash;

(b)      all of Sellers' articles of incorporation, articles of organization, bylaws, operating agreements and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company, limited partnership or other entity;

(c)      all equity securities of any Seller and all net operating losses of any Seller;

(d)      all Rejected Contracts and all Postpetition Contracts designated by Buyer as "Excluded" pursuant to Section 2.6(c)(ii) below;

(e)      the Excluded Claims;

(f)      all rights, interests or claims with respect to or arising under the BUCA PHI Customer Programs, including any Accounts Receivable with respect thereto;

(g)      any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees);

(h)      any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records referenced in subsection (2) to the extent that such portions relate to the Business or any Purchased Asset;

(i)      all Permits other than the Assumed Permits;

19

(j) any Employee Benefit Plan, including all assets maintained or held (including all deposits) pursuant to or in connection with the Health Plans or the 401(k) plan(s) of Sellers (except with respect to the Excalibur Funds and as specifically provided in Section 6.4(c)(ix) below), and any other employee benefit plan or program of any Affiliate of Seller or any Seller's ERISA Affiliate;

(k) all Insurance Policies (including with respect to directors and officers liability insurance) and all rights, claims and proceeds payable thereunder, except to the extent included in the Purchased Assets, including rights to discounts, credits and refunds arising from such Insurance Policies;

(l) the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement; and

(m) any asset owned by BUCA PHI.

**Section 2.3    Assumption of Assumed Liabilities**. On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assigned Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Section 2.6), and provided that the following shall not include any Excluded Claims, as of the Closing, the following obligations of Sellers related to the Purchased Assets acquired in respect of such Closing, and no others shall be assumed by Buyer (or, in the case of clause (g) below, Buyer's wholly-owned Subsidiary, BDB Excalibur, LLC, a Delaware limited liability company ("BDB Excalibur") (the "Assumed Liabilities"):

(a) all Liabilities arising under the Assigned Contracts existing from and after the Closing (but not arising out of any breach or default thereof prior to the Closing and not with respect to any obligations thereunder that are required to be performed by Sellers on or prior to the Closing);

(b) all Liabilities of Sellers under the Seller Customer Programs;

(c) all Liabilities of Sellers with respect to utilities for the Continuing Restaurants, whether arising prior to, on or after the Petition Date;

(d) all Liabilities as of the Closing with respect to trade payables incurred by Sellers in the ordinary course of business and arising from and after the Petition Date, which, after application of applicable Deposits, aggregates no more than $300,000.00;

(e) all Liabilities as of the Closing for accrued but unpaid base wages, base salary and benefits owing to Transferred Employees and Excluded Employees and arising from and after the Petition Date, in an aggregate amount not to exceed $1,950,000.00;

(f) all Liabilities as of the Closing for accrued but unpaid sales Taxes arising from and after the Petition Date, in an aggregate amount not to exceed $970,000.00;

20

(g)     all Taxes owed to any Tax authority assessed with respect to the Purchased Assets for any period ending after the Closing Date; provided that to the extent any Taxes relate to a Tax period that begins prior to the Closing Date and ends after the Closing Date, Sellers and Buyer agree to work in good faith to pro rate the amounts payable by each Party pursuant to the terms of this Agreement;

(h)     all Liabilities of Ex under the Excalibur Funds and the Unions, but with respect to any unfunded Liabilities of Ex owed to (i) the Excalibur Funds as of the Closing, such unfunded Liabilities assumed by BDB Excalibur shall not exceed an aggregate amount to be agreed upon between Sellers and Buyer prior to the Closing, and (ii) the Unions as of the Closing, such unfunded Liabilities assumed by BDB Excalibur shall not exceed $15,000 in the aggregate; and

(i)     all Cure Costs payable with respect to Assigned Prepetition Contracts, including Cure Costs for Assigned Prepetition Contracts that are Leases.

**Section 2.4     Excluded Liabilities**.  Notwithstanding anything herein to the contrary, except for the Assumed Liabilities, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers whatsoever associated with the Purchased Assets, the Business or with respect to any other properties, rights, contracts or other assets of Sellers, existing on the Closing Date, including but not limited to any of the following Liabilities which, in each case, Sellers shall expressly retain (a) all Taxes owed by Sellers to any Tax authority for any period ending on or prior to the Closing Date, (b) all Liabilities of Sellers related to the Excluded Assets, whether such Liabilities arise before or after the Closing Date, (c) all Liabilities of Sellers owing to Parent or any of its Affiliates, (d) all Liabilities of Sellers under the PHI MSA, (e) all Liabilities of Sellers under the BUCA PHI Customer Programs, (f) all Liabilities with respect to any current or former employee of or other individual service provider providing services to any Seller, any Seller's ERISA Affiliate or any Affiliate of any Seller or arising at any time except for obligations incurred by Buyer with respect to Transferred Employees due to events occurring with Buyer after Closing, (g) all Liabilities with respect to Seller Transaction Expenses, and (h) all Liabilities or obligations with respect to any Employee Benefit Plan (other than as provided under Section 2.3(e)) and any other employee benefit plan, program or policy of any Affiliate of Seller or any Seller's ERISA Affiliate (all such liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities").

**Section 2.5     Consideration**.  In consideration of the sale of the Purchased Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") shall be composed of the following:

(a)     a credit bid, on a dollar-for-dollar basis, of $27,000,000.00 with respect to the Main Street Obligations (the "Credit Bid");

(b)     all Cure Costs payable in cash with respect to Assigned Prepetition Contracts, including Cure Costs for Assigned Prepetition Contracts that are Leases; and

21

(c)     the assumption by Buyer of the Assumed Liabilities (other than the Cure Costs).

**Section 2.6**     <u>**Assignment and Assumption of Contracts; Excluded Locations**</u>.

(a)     <u>Assignment and Assumption of Prepetition Contracts at Closing</u>.

(i)     <u>Schedule 2.6(a)(i)</u> attached hereto sets forth (x) each Prepetition Contract (including each Lease) to which any Seller is a party or by which any Seller is bound and that is used in or related to the Business or any of the Purchased Assets, (y) all Cure Costs (if any) for each such Prepetition Contract and (z) a detailed description of each such Prepetition Contract (such schedule is referred to herein as the "<u>Contract and Cure Schedule</u>").

(ii)     By October 16, 2024, Buyer shall have delivered notice to Sellers (including by e-mail notice from Buyer's counsel to Sellers' counsel), which Sellers shall then file with the Bankruptcy Court, designating each Prepetition Contract on the Contract and Cure Schedule as "Assumed" or "Rejected." Each Prepetition Contract so designated as "Assumed" is referred to herein as an "<u>Assumed Contract</u>"; and each Prepetition Contract so designated as "Rejected" is referred to herein as a "<u>Rejected Contract</u>." Notwithstanding the foregoing, Buyer shall have the right (in its sole and absolute discretion) to change any such designation and to notify the Sellers in writing of any such change until Closing in which case such Prepetition Contract shall become an Assumed Contract or a Rejected Contract as indicated by such changed designation.

(iii)     Sellers shall provide timely and proper written notice of the procedures for the assumption and assignment of Prepetition Contracts to parties to all Prepetition Contracts and will take all other actions necessary to cause all Assumed Contracts to be assumed by Sellers (to the extent not already assumed pursuant to prior Bankruptcy Court order(s)) and assigned to Buyer. Buyer shall, at or prior to Closing, comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign to Buyer the Assumed Contracts.

(iv)     Sellers shall be responsible for the verification of all Cure Costs for each Assumed Contract and shall use commercially reasonable efforts to correctly calculate the proper Cure Costs, if any, for each Assumed Contract prior to the filing of the Contract and Cure Schedule. To the extent that any Assumed Contract requires the payment of Cure Costs in order to be assumed pursuant to Section 365 of the Bankruptcy Code, whether determined prior to or after the Closing, the Cure Costs related to such Assumed Contract, or any portion thereof, shall be paid by Buyer (if the Cure Costs are Assumed Liabilities) on such date that the Assumed Contract is assumed by the applicable Seller and assigned to Buyer or on such other date as agreed to between Buyer and the counterparty to such Assumed Contract. Buyer shall be responsible for providing adequate assurances of future performance and any other cure of a nonmonetary nature (in addition to any Cure Cost) with regard to an Assumed Contract that requires any action other than the payment of

22

money, and shall be confirmed and agreed to by Buyer at or before the Closing or at such subsequent time when such Assumed Contract is assumed by Sellers and assigned to Buyer.

(v)     At Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents requested by Buyer, assign to Buyer (the consideration for which is included in the Purchase Price), and Buyer shall assume from Sellers (to the extent not already assumed pursuant to prior Bankruptcy Court order(s)), each of the Assumed Contracts.

(b)     Assigned Prepetition Contracts.  Unless otherwise agreed by Sellers and Buyer, at the Closing, Sellers shall promptly cause all Rejected Contracts to be rejected pursuant to Section 365 of the Bankruptcy Code or as soon after Closing as practicable. On each date that each Assumed Contract is assumed and assigned to Buyer pursuant to this Section 2.6 (including, without limitation, the approval of the assumption and assignment thereof by the Bankruptcy Court), such Assumed Contract shall constitute an "Assigned Prepetition Contract" and shall be an Assigned Prepetition Contract for all purposes under this Agreement; provided that no Assumed Contract shall be assigned or transferred pursuant to this Agreement unless the Bankruptcy Court has previously approved the assumption and assignment thereof to Buyer.

(c)     Assignment of Postpetition Contracts at Closing.

(i)     Schedule 2.6(c)(i) attached hereto sets forth (x) each Postpetition Contract to which any Seller is a party or by which any Seller is bound and that is used in or related to the Business or any of the Purchased Assets, and (y) a description of each such Postpetition Contract (such schedule is referred to herein as the "Postpetition Contract Schedule").

(ii)     No later than two (2) days prior to the Sale Hearing, Buyer shall, by delivering written notice to Sellers, designate each Postpetition Contract on the Postpetition Contract Schedule as "Purchased" or "Excluded."  Notwithstanding the foregoing, Buyer shall have the right (in its sole and absolute discretion) to change any such designation and to notify the Sellers in writing of any such change until Closing in which case such Postpetition Contract shall become an Assigned Postpetition Contract (as defined below) or an Excluded Asset as indicated by such changed designation.

(iii)     At Closing, or at such later date upon which Sellers obtain any necessary consent of a counterparty to a Postpetition Contract, Sellers shall, pursuant to the Sale Order and the Postpetition Contract Assignment Agreement(s) and other transfer and assignment documents requested by Buyer, assign to Buyer (the consideration for which is included in the Purchase Price), and Buyer shall assume from Sellers, each of the Postpetition Contracts designated by Buyer as "Purchased" pursuant to Section 2.6(c)(ii), and each such Postpetition Contract

23

shall constitute an "Assigned Postpetition Contract" and shall be an Assigned Postpetition Contract for all purposes under this Agreement.

(d)     Non-Assignment of Postpetition Contracts and Permits.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Postpetition Contract or any Permit, if an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof or in any way adversely affect any of the rights of Buyer (unless the restrictions on assignment or transfer thereunder would be rendered ineffective pursuant to Bankruptcy Code Sections 363 or 365 or Sections 9-406 through 9-409, inclusive, of the Uniform Commercial Code, as amended), as the assignee or transferee of such Postpetition Contract or Permit (as the case may be) thereunder.  From and after the Execution Date, including through and after the Closing, Sellers shall use their respective reasonable best efforts to obtain all consents or approvals that are required with respect to Assigned Postpetition Contracts and Permits for Sellers to assign to Buyer such Assigned Postpetition Contracts and Permits.  For the avoidance of doubt, nothing in this Section 2.6(d) shall be deemed to (x) limit the Liability, if any, of Sellers pursuant to this Agreement for failing to have obtained any required consent or approval or (y) alter or limit any rights of Buyer under Section 8.1.

(e)     Excluded Locations.  As of the Closing, (i) any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts shall be deemed to have been classified as Continuing Restaurants, and (ii) any of Sellers' restaurant locations with respect to which the associated Leases have been classified as Rejected Contracts shall be deemed to have been classified as Excluded Restaurants.

**Section 2.7     Closing**.  The closing of the Contemplated Transactions (the "Closing") shall take place remotely by electronic exchange of counterpart signature pages on the first Business Day on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in ARTICLE VII shall have been satisfied or waived (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) (the "Closing Date").  The Closing shall occur at 11:00 a.m. Central Time on the Closing Date, but shall be deemed to have occurred at 12:01 a.m. (prevailing time at each Continuing Restaurant) on the Closing Date, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto, subject to Section 8.1(e).

**Section 2.8     Deliveries at Closing**.

(a)     At the Closing, Sellers shall deliver to Buyer and/or its Permitted Designees the following documents and other items, duly executed by Sellers, as applicable:

(i)     one or more Bills of Sale substantially in the form of Exhibit A attached hereto (each, a "Bill of Sale") (if requested by Buyer, Sellers shall execute a separate Bill of Sale with respect to each Continuing Restaurant);

(ii)     one or more Assignment and Assumption Agreements substantially in the form of Exhibit B attached hereto (each, an "Assignment and Assumption Agreement") (if requested by Buyer, Sellers shall execute a separate Assignment and Assumption Agreement with respect to each Continuing Restaurant);

(iii)    instruments of assignment substantially in the forms of Exhibit C and Exhibit D attached hereto for each Registered trademark and domain name, respectively, transferred or assigned hereby and for each pending application therefor (collectively, the "Intellectual Property Assignments");

(iv)    instruments of assignment reasonably requested by Buyer pursuant to which each Seller assigns any right, title or interest in any other Intellectual Property of such Seller;

(v)     a completed and duly executed IRS Form W-9 from each Seller;

(vi)    if deemed necessary by Buyer, one or more Management Agreements substantially in the form of Exhibit E;

(vii)   one or more Postpetition Contract Assignment and Assumption Agreements substantially in the form of Exhibit F attached hereto (each, a "Postpetition Contract Assignment Agreement");

(viii)  the Transition Services Agreement;

(ix)    originals (or, to the extent originals are not available, copies) of all Assigned Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to Buyer;

(x)     physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(xi)    certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

(xii)   all other documents, instruments and writings reasonably requested by Buyer to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

(b)     At the Closing, Buyer shall deliver to Sellers, or the designated third-party recipients pursuant to Section 2.5, the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

(i)     the Bill(s) of Sale;

(ii)    the Assignment and Assumption Agreement(s);

25

(iii)    the Closing Payment by wire transfer of immediately available funds to an account designated by Sellers;

(iv)    if deemed necessary by Buyer, one or more Management Agreements substantially in the form of Exhibit E;

(v)    the Postpetition Contract Assignment Agreement(s);

(vi)    the Transition Services Agreement; and

(vii)    all other documents, instruments and writings reasonably requested by Sellers to be delivered by Buyer at or prior to the Closing pursuant to this Agreement.

**Section 2.9    Allocation**. Within 90 calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all capitalized costs and other relevant items) among the Purchased Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate) and deliver a copy of same to Sellers.  Sellers shall have 15 days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith.  Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule. Sellers shall also retain the right to dispute Buyer's proposed and final allocations, with any unresolved dispute to be determined by the Bankruptcy Court.  Buyer and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation.  Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation unless required to do so by applicable Law; provided, however, that the foregoing shall not limit the ability of Buyer or Sellers to settle or compromise any matter with respect to any Tax related audit or other proceeding with any Governmental Entity.

## ARTICLE III.
## SELLERS' REPRESENTATIONS AND WARRANTIES

Each Seller, jointly and severally, represents and warrants to Buyer that except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"):

**Section 3.1    Organization of Sellers; Good Standing**.

(a)    Except as set forth on Schedule 3.1 of the Disclosure Schedule, each Seller is duly incorporated or formed, validly existing and in good standing under the Laws of its state of incorporation or formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. A Seller's failure to be in good standing, as reflected on Schedule 3.1 of the Disclosure Schedule, does not have a Material Adverse Effect nor does it materially adversely affect the Sellers' ability to enter into the Contemplated Transactions or perform is obligations hereunder. Each Seller has all requisite corporate, limited liability company, limited partnership, or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

26

(b)     Each Seller is duly authorized to do business and is in good standing as a foreign corporation, limited liability company or limited partnership in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.2     Authorization of Transaction**.  Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)     each Seller has all requisite power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which such Seller is a party have been duly authorized by such Seller and no other action on the part of such Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)     this Agreement has been duly and validly executed and delivered by each Seller, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable.  Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that a Seller is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against each such Seller, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3     Noncontravention**.  Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (a) conflict with or result in a breach of the certificate or articles of incorporation, organization or formation, by-laws, operating agreement, or other organizational documents of any Seller, (b) violate any Law to which any Seller is, or its respective assets or properties are, subject, or (c) subject to the entry of the Sale Order, conflict with, any Assumed Contract, and, in the case of clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.4     Compliance with Laws**.  Except as set forth on <u>Schedule 3.4 of the Disclosure Schedule</u>, Sellers are and have been in compliance in all material respects with all applicable Laws applicable to the Business or the Purchased Assets.  To Sellers' Knowledge, no

15604874v4

Seller has received any oral or written notice or other written communication from any Governmental Entity or other Person (a) asserting any violation of, or failure to comply with, any requirement of any Law, or (b) notifying such Seller that it is under governmental investigation with respect to the violation of any applicable Permit.

**Section 3.5** __Title to Purchased Assets__. Sellers, as of the Closing, will have good and valid title to, or, in the case of leased assets, will have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under __Section 2.7__, Sellers will transfer, sell, assign and convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at such time, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code.

**Section 3.6** __Contracts__. __Schedule 3.6 of the Disclosure Schedule__ sets forth the following Contracts (all Contracts listed or required to be listed herein are referred to as "__Material Contracts__") as of the Execution Date:

(a) all Leases (including all amendments thereto) that pertain to each Continuing Restaurant;

(b) all Contracts under which any Seller leases personal property in connection with the Business;

(c) all Contracts that provide for payments in excess of $100,000 over a 12-month period;

(d) all Contracts that are material to the operation of the Business, in the reasonable discretion of Sellers, and that Sellers' counterpart(y)(ies) may terminate without more than 90 days' prior notice without a breach thereof by Sellers;

(e) all Contracts between any Seller, on the one hand, and BUCA PHI or any Affiliate of BUCA PHI, on the other;

(f) all Contracts for the sale of any Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

(g) all franchise agreements or other similar Contracts relating to the Business;

(h) all employment, confidentiality, and/or noncompetition Contracts with employees of any Seller and Contracts with independent contractors or consultants (or similar arrangements) engaged in connection with the Business, in each case providing for cash compensation exceeding $25,000 per year;

(i) all Contracts with any PEO;

28

(j)      all collective bargaining agreements related to the Business;

(k)      all Contracts with any material supplier of the Business;

(l)      all Postpetition Contracts (which, for the avoidance of doubt, shall be separately identified on <u>Schedule 3.6 of the Disclosure Schedule</u>);

(m)      all Contracts with any Governmental Entity related to the Business; and

(n)      all other Contracts that are material to the operation of the Business at the Continuing Restaurants and not previously disclosed pursuant to this <u>Section 3.6</u>.

To Sellers' Knowledge, and except as set forth on <u>Schedule 3.6 of the Disclosure Schedule</u>, each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of the applicable Seller and, to Sellers' Knowledge, of the other parties thereto, enforceable against each of them in accordance with its terms, and upon consummation of the Contemplated Transaction, shall continue in full force and effect without penalty or other adverse consequences. Except as set forth on <u>Schedule 3.6 of the Disclosure Schedule</u>, no Seller is in material default under any Material Contract, nor, to Sellers' Knowledge, is any other party to any Material Contract in breach of or default thereunder, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a breach or default by any Seller or any other party thereunder. Except as set forth on <u>Schedule 3.6 of the Disclosure Schedule</u>, no party to any of the Material Contracts has exercised any termination rights with respect thereto, and no party has given notice of any significant dispute with respect to any Material Contract.  Sellers have and will transfer to Buyer at the Closing, good and valid title to the Assigned Contracts, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities).  To Sellers' Knowledge and except as set forth on <u>Schedule 3.6 of the Disclosure Schedule</u>, Sellers have delivered to Buyer true, correct and complete copies of all of the Material Contracts, together with all amendments, modifications or supplements thereto.

**Section 3.7**   <u>**Intellectual Property**</u>.

(a)      To Sellers' Knowledge and except for those items of Intellectual Property described in clause (d) of the definition thereof, <u>Schedule 3.7 of the Disclosure Schedule</u> sets forth a true and complete list of (i) all material items of Intellectual Property that are owned by any Seller or used in or related to the Business, (ii) all material Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, excluding licenses for off-the-shelf software, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property.  To Sellers' Knowledge, except for any Intellectual Property owned by Buyer, Sellers own all such Intellectual Property free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities) and subject to entry of the Sale Order, and all such Intellectual Property is valid, subsisting and, to Sellers' Knowledge, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

29

(b)    To Sellers' Knowledge and except as set forth on <u>Schedule 3.7 of the Disclosure Schedule</u>, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person. To Sellers' Knowledge and except as set forth on <u>Schedule 3.7 of the Disclosure Schedule</u>, no third party is infringing any Intellectual Property owned by any Seller and included in the Purchased Assets, except as would not reasonably be expected to have a Material Adverse Effect.

**Section 3.8    <u>Litigation</u>**. Schedule 3.8 of the Disclosure Schedule sets forth all unresolved material Litigation brought by or against the Business, the Purchased Assets, or any Seller.

**Section 3.9    <u>Employees and Employment Matters</u>**.

(a)    <u>Schedule 3.9 of the Disclosure Schedule</u> sets forth a list as of the Execution Date of all employees of Sellers and their respective (i) titles, responsibilities, and classification as exempt or non-exempt, (ii) dates of hire, (iii) current base salary or wages, and whether they are paid hourly or salary, (iv) all bonuses, commissions, and incentive compensation paid during 2024, (v) accrued vacation and sick leave, and (vi) the restaurant location at which such employee performs services. To Sellers' Knowledge and except as set forth on <u>Schedule 3.9 of the Disclosure Schedule</u>, no Seller is a party to or bound by any collective bargaining agreement covering the Current Employees (as determined as of the Execution Date), nor is there any ongoing strike, walkout, work stoppage, or other material collective bargaining dispute affecting any Seller with respect to the Business. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the Execution Date).

(b)    Except in any case where the failure to be in compliance would not have a Material Adverse Effect or as set forth on <u>Schedule 3.9 of the Disclosure Schedule</u>, Sellers are and have been in compliance with all applicable Laws relating to employment of labor, including all applicable Laws relating to wages, hours, overtime, collective bargaining, employment discrimination, harassment, reasonable accommodations, statutory leave, civil rights, safety and health, workers' compensation, pay equity, and classification of employees and independent contractors. No individual providing services to Sellers is classified as an independent contractor.

(c)    To Sellers' Knowledge, there are no (and during the three years preceding the date hereof, there have not been any) pending or threatened (i) unfair labor practice complaints against Sellers before the National Labor Relations Board or any other Governmental Authority, (ii) charges with respect to or relating to any Seller's employment practices before the Equal Employment Opportunity Commission, any state fair employment practice agency or any other Governmental Authority, or (iii) employment claims, investigations, or actions, including, without limitation with respect discrimination, harassment, reasonable accommodations, statutory leave, civil rights, safety and health,

workers' compensation, payment of wages, salary, overtime pay or other wage and hour issues with respect to any current or former employees of Sellers.  To Sellers' Knowledge, no Occupational Safety and Health Administration investigations have been made of any Seller during the past three (3) years.

(d)      Sellers have not received during the past three (3) years any written notice that any Seller is or has been the subject of any inspection or, to Sellers' Knowledge, investigation, relating to its compliance with or violation of the Immigration Reform and Control Act of 1986 and all related Laws promulgated thereunder (the "Immigration Laws"), nor has any Seller been warned in writing, fined or otherwise penalized by reason of any failure to comply with the Immigration Laws, nor is any such Proceeding pending or, to Sellers' Knowledge, threatened. Sellers are in compliance with all Immigration Laws. Each Current Employee is (A) a United States citizen; (B) a lawful permanent resident of the United States; or (C) an alien authorized to work in the United States either specifically for Seller or for any United States employer.  Sellers have completed a Form I-9 (Employment Eligibility Verification) for each Current Employee and each such Form I-9 has since been updated as required by applicable Law and is correct and complete as of the Execution Date.

**Section 3.10    Employee Benefit Plans**.

(a)      Except as set forth on Schedule 3.10(a) of the Disclosure Schedule, none of Sellers nor any of their ERISA Affiliates has ever maintained or had an obligation to contribute to or has, ever had or could have any Liability with respect to (i) a "single employer plan" (as such term is defined in Section 4001(a)(15) of ERISA) or any plan subject to Section 412 of the IRC or Section 302 of Title I of ERISA, (ii) any plan subject to Title IV of ERISA, (iii) a "multiple employer plan" (meaning a plan sponsored by more than one employer within the meaning of ERISA Sections 4063 or 4064 or Section 413(c) of the IRC), (iv) a "multiemployer plan" (as such term is defined in Sections 3(37) or 4001(a)(3) of ERISA) (a "Multiemployer Plan"), (v) a "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA), or (vi) a funded welfare benefit plan (as such term is defined in Section 419 of the IRC).

(b)      To Sellers' Knowledge. each Employee Benefit Plan and all related trusts have been maintained, funded and administered, in accordance with the terms of such Employee Benefit Plan and applicable Law.  Each Employee Benefit Plan may be amended or terminated without any liability to Buyers.  Each Employee Benefit Plan that is a group health plan has at all times complied, with the requirements of IRC Section 4980H, including the distribution of a "summary of benefits and coverage" to employees and calculations of full-time employees and full-time equivalent employees, and no "Employer Shared Responsibility" payments described in IRC Section 4980H have been incurred. There are no facts or circumstances that would be reasonably likely to subject Sellers to any assessable penalty or payment under Section 4980H of the IRC with respect to any period prior to the Closing.  Sellers and each Employee Benefit Plan that is a "group health plan" as defined in Section 733(a)(1) of ERISA (an "Employee Health Plan") (i) are currently in material compliance with the Patient Protection and Affordable Care Act ("PPACA"), the Health Care and Education Reconciliation Act of 2010 ("HCERA") and

31

all regulations and guidance issued thereunder (collectively, with PPACA and HCERA, the "Healthcare Reform Laws"), (ii) have been in material compliance with applicable Healthcare Reform Laws since March 23, 2010, and (iii) no event has occurred and, to any Sellers' Knowledge, no condition or circumstance exists, that could reasonably be expected to subject Sellers or any Employee Health Plan to penalties or excise taxes under Sections 4980D, 4980H, or 4980I of the IRC or any other provision of the Healthcare Reform Laws.

(c)    None of Sellers nor any of their ERISA Affiliates has (i) incurred or reasonably expects to incur, either directly or indirectly, any Liability under Title I or Title IV of ERISA or related provisions of the IRC or applicable local Law, (ii) failed to timely pay premiums to the Pension Benefit Guaranty Corporation, (iii) withdrawn from any Employee Benefit Plan, (iv) engaged in any transaction which would give rise to Liability under Section 4069 or Section 4212(c) of ERISA, (v) incurred Taxes under Section 4971 of the IRC with respect to any Single Employer Plan, or (vi) participated in a multiple employer welfare arrangement (MEWA).

**Section 3.11    Real Property**.

(a)    Sellers do not own any real property.

(b)    Schedule 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases for such Leased Real Property.  Sellers have made available to Buyer true and complete copies of such Leases, as amended through the Execution Date.  Except as set forth on Schedule 3.11(b) of the Disclosure Schedule, to Seller's Knowledge the Leased Real Property has no material defects that at any one location would reasonably be expected to cost Sellers $10,000 or more to repair, and is otherwise in good operating condition and repair and is adequate and suitable to conduct the business of Sellers as currently conducted.

**Section 3.12    Permits**.

(a)    Schedule 3.12(a) of the Disclosure Schedule contains a list of all material Permits that, to Seller's Knowledge, Sellers hold as of the Execution Date in connection with the operation of the Business.  Sellers are in compliance with, and during the past three (3) years have complied with, all Permits in all material respects.  No Seller has received any oral or written notice or other written communication from any Governmental Entity or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Assumed Permit, (ii) notifying such Seller of the non-renewal, revocation, material modification or withdrawal of any Assumed Permit, or (iii) notifying such Seller that it is under governmental investigation with respect to the violation of any applicable Assigned Permit. As of the Execution Date, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits. To Sellers' Knowledge, all required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed.

15604874v4

(b)      Schedule 3.12(b) of the Disclosure Schedule sets forth a complete and correct list as of the Execution Date of all liquor licenses (including, without limitation, beer and wine licenses) held or used by Sellers, including the Seller in whose name such license is issued, a general description of the restaurant location to which the license relates, and the license number (collectively, the "Liquor Licenses"). To Sellers' Knowledge, except as set forth on Schedule 3.12(b) of the Disclosure Schedule, each Seller is in compliance in all material respects with all applicable state, municipal and other Laws with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within each of the restaurant locations of such Seller where the Leases constitute Assumed Contracts, subject to and in accordance with all applicable provisions of the Liquor Licenses.  To Sellers' Knowledge, since December 31, 2021, (i) there has been no material Litigation brought or threatened in writing to be brought by or before a Governmental Entity in respect of any such Liquor License or the activities of any Seller in connection with any such Liquor License (or in connection with any other liquor licenses previously held or used by such Seller), (ii) no such Liquor License is subject to any due but unpaid Tax obligation owed to a Governmental Entity, the outstanding nature of which would preclude transfer of such Liquor License from any Seller to Buyer, and (iii) no such Liquor License has been threatened by a Governmental Entity to be revoked, limited or not renewed.

**Section 3.13    Environmental**.  To Sellers' Knowledge and except as set forth on Schedule 3.13 of the Disclosure Schedule, at all times during the past five (5) years, Sellers have conducted the Business and operated the Purchased Assets in accordance with all applicable Laws, regulations, or other legal requirements relating to the protection of the environment, pollution or human health and safety and that are applicable to Sellers and the Business.

**Section 3.14    Taxes**.

(a)      To Sellers' Knowledge and except for delinquent franchise Taxes as set forth on Schedule 3.1 of the Disclosure Schedule, all material Tax Returns required to have been timely filed by or with respect to Sellers and the Purchased Assets have been filed (taking into account any extension of time to file granted or obtained) and such Tax Returns are true, correct and complete in all material respects.

(b)      To Sellers' Knowledge and except for delinquent franchise taxes as set forth on Schedule 3.1 of the Disclosure Schedule, all material Taxes required to have been paid by or with respect to Sellers and the Purchased Assets have been paid, other than Taxes of Sellers the payment of which is prohibited or stayed by the Bankruptcy Code.

(c)      There are no Liens with respect to Taxes on any of the Purchased Assets, other than Permitted Liens and such Liens that will be released upon entry of the Sale Order, as applicable.

(d)      To Sellers' Knowledge there are no audits, examinations, investigations, or other proceedings in respect of Taxes or Tax Returns of Sellers or the Purchased Assets, pending or threatened.

33

(e)     All Inventory and similar items included in the Purchased Assets is, immediately prior to the sale to Buyer hereunder, located in Arizona, California, Florida, Georgia, Illinois, Indiana, Kentucky, Minnesota, Missouri, Nevada, New Mexico, Ohio, Tennessee, Texas, and Washington.

(f)     The sale of the Purchased Assets to Buyer hereunder constitutes an "occasional", "isolated", "casual" or similar sale of such Purchased Assets for sales, use and similar Tax purposes in each of the states in which the Purchased Assets are located immediately prior to their sale to Buyer hereunder, with such sale exempt from such Taxes in each such state.

**Section 3.15  Brokers' Fees**.  Except as set forth on Schedule 3.15 of the Disclosure Schedule, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated to pay.

**Section 3.16  No Other Representations or Warranties**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER SELLERS NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE CONTEMPLATED TRANSACTIONS, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF ANY SELLER OR ANY OF THEIR AFFILIATES).

34

THE PROVISIONS OF THIS <u>SECTION 3.16</u> SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV.
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows:

**Section 4.1** <u>**Organization of Buyer**</u>. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2** <u>**Authorization of Transaction**</u>.

(a)     Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)     The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)     This Agreement has been duly and validly executed and delivered by Buyer, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.  Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3** <u>**Noncontravention**</u>.  Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements) will (a) conflict with or result in a breach of the certificate of formation or other organizational documents of Buyer, (b) subject to any consents required to be obtained from any Governmental Entity, to the knowledge of Buyer, violate any Law to which Buyer is, or its assets or properties are subject, or (c) conflict with, result in a breach of, constitute a default under, result in the

35

acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the Contemplated Transactions.  Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the Contemplated Transactions, except as provided in <u>Section 6.11</u> and where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the Contemplated Transactions.

**Section 4.4**    <u>**Financial Capacity**</u>.  As of the Closing, Buyer (a) will have the resources (including sufficient funds available to pay the Cure Costs and any other expenses and payments incurred by Buyer in connection with the Contemplated Transactions) and capabilities (financial or otherwise) to perform its obligations hereunder, and (b) will not have incurred any obligation, commitment, restriction or Liability of any kind, that would materially impair or materially adversely affect such resources and capabilities.

**Section 4.5**    <u>**Adequate Assurances Regarding Executory Contracts**</u>. Buyer will use commercially reasonable efforts to assure that, as of the Closing, it will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Prepetition Contracts.

**Section 4.6**    <u>**Good Faith Purchaser**</u>.  Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets.  Buyer has negotiated and entered into this Agreement in good faith.

**Section 4.7**    <u>**Brokers' Fees**</u>.  Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which any Seller could become liable or obligated to pay.

**Section 4.8**    <u>**Condition of Business**</u>.  Buyer is an informed and sophisticated purchaser, and has engaged or had the opportunity to engage advisors, experienced in the evaluation and purchase of properties and assets such as the Purchased Assets and assumption of Liabilities such as the Assumed Liabilities as contemplated hereunder. Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Buyer acknowledges that Sellers have given Buyer reasonable and open access to the key employees, documents and facilities of the Business.  Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in <u>ARTICLE III</u> of this Agreement, Sellers (including each of their directors, officers, employees, agents, stockholders, Affiliates, consultants, counsel, accountants and other representatives) make no express or implied representations or warranties whatsoever, including, without limitation, any representation or warranty as to physical condition or value of any of the Purchased Assets or the future profitability or future earnings performance

36

of the Business. Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

## ARTICLE V.
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1    Certain Efforts; Cooperation**.

(a)    Subject to the terms and conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the Contemplated Transactions (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in ARTICLE VII), except as otherwise provided in Section 5.2; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Chapter 11 Cases.

(b)    On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Purchased Assets, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities) expressly contemplated by the Sale Order; provided, however, that Sellers' obligations hereunder shall only continue until the later of the day that (i) all Liquor Licenses have been transferred to Buyer and/or replacements thereof have been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (ii) the Chapter 11 Cases are closed or dismissed.  Buyer shall at all times take all appropriate actions necessary to permit, and shall refrain from taking any action that would prevent, the Bankruptcy Court to make findings in the Sale Order that (i) Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code, (ii) that the sale of the Purchased Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under Section 363(n) of the Bankruptcy Code, and (iii) Buyer is not a successor to Sellers with respect to the Purchased Assets.

**Section 5.2    Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and reasonable professional fees and other costs as described in this Agreement as are required for Sellers to comply with the obligations hereunder and (ii)

37

Sellers' obligations hereunder shall only continue until the later of the day that (A) all Liquor Licenses have been transferred to Buyer and/or replacements thereof have been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (B) the Chapter 11 Cases are closed or dismissed.

(b)     Sellers and Buyer shall cooperate with one another in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and reasonable professional fees and other costs as described in this Agreement as are required for Sellers to comply with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the later of the day that (A) all Liquor Licenses have been transferred to Buyer and/or replacements thereof have been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (B) the Chapter 11 Cases are closed or dismissed.

(c)     Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Subsidiaries and/or Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the Contemplated Transactions and incorporate the other Party's reasonable comments, (iii) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the Contemplated Transactions unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to participate in and/or attend such meeting and/or discussion, and (iv) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and/or Affiliates and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the Contemplated Transactions; provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (A) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (B) to remove references concerning financing arrangements, (C) as necessary to comply with contractual arrangements, and (D) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written

permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

**Section 5.3**     **Bankruptcy Actions**.

(a)     Sale Procedures.   Buyer shall have filed the Sale Motion on or before August 14, 2024, which motion shall seek approval of the Sale Procedures Order in a form of order attached as Exhibit H hereto.

(b)     Sale Order. The Sale Order shall be entered no later than the Sale Order Deadline. The Sale Order shall be in a form acceptable to Buyer in its reasonable discretion and provide, among other things, that:

(i)     this Agreement is valid and enforceable;

(ii)     this Agreement and the Contemplated Transactions are approved;

(iii)     the Purchase Price may be paid Buyer by way of the Credit Bid;

(iv)     on the Closing Date, the Purchased Assets shall be sold to Buyer free and clear of any and all Liens (except for Permitted Liens), including any Liens granted during the Chapter 11 Cases, and Liabilities (other than Assumed Liabilities);

(v)     on the Closing Date, the Assigned Prepetition Contracts shall be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and, unless a counterparty to an Assigned Prepetition Contract has agreed otherwise in writing, the Buyer shall pay the Cure Costs that are Assumed Liabilities due in connection with the assumption and assignment of Assigned Prepetition Contracts;

(vi)     all causes of actions against any counterparty to the Assigned Contracts, related in any way to the Assigned Contracts, shall be forever released and waived by Sellers. Sellers, however, shall be entitled to assert any defenses against any claim asserted by any counterparty to the Assigned Contracts; and

(vii)     all persons and entities, including, governmental, tax and regulatory authorities, lenders, trade and other creditors holding interests or claims of any kind or nature whatsoever against Sellers or their assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with or in any way relating to Sellers, the Business, the Purchased Assets, or the operations of Sellers prior to the Closing shall have no claims against Buyer, its Affiliates, or their respective successors or assigns, the Business, or the Purchased Assets, subject to rights of parties or individuals for claims arising out of Assumed Liabilities.

39

(c)    <u>Sale Order Findings</u>.    The Sale Order shall contain findings by the Bankruptcy Court that (i) Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code, (ii) Buyer is not a successor to Sellers, and (iii) the sale of the Purchased Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under Section 363(n) of the Bankruptcy Code, unless in the reasonable judgment of Sellers' professionals, after consultation with Buyer, Sellers believe there exists a factual basis that would preclude the Bankruptcy Court from making such a finding.

(d)    <u>Cooperation</u>.    Sellers and Buyer agree to use commercially reasonable efforts to cooperate, assist and consult with each other to obtain the issuance and entry of the Sale Order and Sale Procedures Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.  The Sale Order shall also indicate that the transactions set forth in this Agreement may be consummated immediately upon entry of the Sale Order and pursuant to Fed. R. Bankr. P. 6004(h), the sale of the Purchased Assets is not stayed pending the expiration of 14 days from the date of entry of the Sale Order.  In the event the Sale Order is appealed, Sellers shall use their commercially reasonable efforts to oppose any such appeal.

(e)    <u>Bankruptcy Court Approval of Sale</u>.    Sellers and Buyer shall cooperate, assist and consult with each other and each use commercially reasonable efforts, to secure the entry of the Sale Order.  In connection with the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, Buyer shall take all actions reasonably required in the discretion of Buyer or otherwise as directed by the Bankruptcy Court to provide "adequate assurance of future performance" by Buyer under the Assumed Contracts after the Closing.

(f)    <u>Liquor Licenses</u>.    Sellers shall seek to have included in the Sale Order a provision that immediately upon the Closing, Buyer shall be entitled to continue to sell alcoholic beverages at the premises included in the Purchased Assets upon the same terms as Sellers were selling such alcoholic beverages until such time as Buyer has had the time and opportunity to obtain its own Liquor Licenses.

**Section 5.4    Conduct of Business**.    From the Execution Date until the earlier of the termination of this Agreement pursuant to <u>Section 8.1</u> or the Closing Date, except (i) as disclosed on <u>Schedule 5.4</u>, (ii) as may be required by the Bankruptcy Court, (iii) for the consequences resulting from the continuation of the Chapter 11 Cases, or (iv) as may be required or contemplated by this Agreement, subject to the terms of the DIP Credit Agreement, each Seller shall conduct, and shall cause its Affiliates to conduct, the Business and maintain the Purchased Assets in the Ordinary Course of Business and use its commercially reasonable efforts to preserve intact the Purchased Assets (and all goodwill relating thereto) and all respective relationships with customers, vendors, creditors, employees, landlords, agents, each Governmental Entity, and others having business relationships with them.  Without limiting the generality of the foregoing, during the period from the date of this Agreement to the Closing, except as otherwise contemplated by this Agreement or as Buyer shall otherwise consent in writing, each Seller shall, and shall cause each of its respective Affiliates to, do the following:

40

(a)    pay all post-petition bills and invoices for post-petition goods or services when due, including rent, CAM, Taxes and other amounts due under the Leases that may become part of the Purchased Assets;

(b)    notify Buyer of any material adverse change in its condition (financial or otherwise), business, properties, assets or liabilities, or of the commencement of or any material development or disposition with respect to any material governmental complaints, investigations, or hearings (or any written threats thereof);

(c)    in the Ordinary Course of Business, maintain and repair all of the material equipment on the premises and the premises themselves;

(d)    maintain in the Ordinary Course of Business customary amounts of cash, cash equivalents and similar cash items at the location of each restaurant in cash registers, safes, strongboxes and lock boxes;

(e)    maintain in the Ordinary Course of Business customary amounts and quality of Inventory;

(f)    comply in all material respects with all Laws applicable to it or having jurisdiction over the Business or any Purchased Asset and will not incur the Worker Adjustment and Retraining Notification Act or any similar Law ("WARN");

(g)    use its commercially reasonable efforts to keep and maintain possession of and compliance with the terms of all Permits (including Liquor Licenses) necessary or required by Law to own, lease and operate its respective properties (and the Purchased Assets) and to carry on the Business or that are material to the operation of the Business or the Purchased Assets, including by taking all actions and submitting all payments, applications, and filings necessary to renew any such Permit due to expire at any time before the Closing Date (or 60 days thereafter);

(h)    use commercially reasonable efforts to (i) conduct the Business in substantially the same manner as conducted as of the Petition Date and only in the Ordinary Course of Business, (ii) preserve the existing business organization and management of the Business intact, (iii) use commercially reasonable efforts to keep available the services of the current Employees, to the extent reasonably feasible, (iv) use commercially reasonable efforts to maintain the existing relations with customers, carriers, centers, distributors, suppliers, creditors, business partners, Current Employees and others having business dealings with the Business, and (v) refrain from changing in any material respect any of its product or service prices or pricing policies (e.g., discount policies) for any of its products or services; and

(i)    maintain insurance coverage with financially responsible insurance companies duly licensed in the states in which Sellers are then operating, substantially similar in all material respects to the insurance coverage maintained by the Business and Sellers on the Petition Date.

41

**Section 5.5    Certain Restricted Conduct**.  Except as set forth on <u>Schedule 5.5</u> or as Buyer shall otherwise consent in advance in writing, during the period from the date of this Agreement to the Closing, no Seller shall, and each Seller shall cause each of its respective Affiliates not to, with respect to the Purchased Assets:

(a)    sell, lease, license, transfer, or dispose of other than in the Ordinary Course of Business any Purchased Assets;

(b)    directly or indirectly, (i) enter into any Contract, or (ii) assume, amend, modify, supplement or terminate, or waive any rights under, any Contract to which Seller is a party or by which it is bound and that is used in or related to the Business or the Purchased Assets (including any Assumed Contract) or take any affirmative action not required by the terms of any such Contract;

(c)    dispose of or permit to lapse any rights in, to or for the use of any material Intellectual Property right;

(d)    other than in the Ordinary Course of Business, including maintenance and repair, authorize, undertake, make, or enter into any commitments obligating any Seller to (i) make or accelerate any capital expenditures that cannot reasonably be substantially completed prior to the Closing or (ii) undertake or approve any material renovation, repair or rehabilitation of any Leased Real Property that cannot reasonably be substantially completed prior to the Closing, except pursuant to a budget approved by the DIP Lenders under the DIP Credit Agreement;

(e)    (i) increase any compensation or enter into or amend, in a way that increases benefits, any employment, severance or other agreement with any of its officers, directors or Current Employees, (ii) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any existing Employee Benefit Plan, except for changes which are required by Law and changes which are not more favorable to participants than provisions presently in effect, (iii) hire any employee or individual independent contractor with annual compensation in excess of $75,000 (except to the extent such hire is in replacement of a Current Employee with comparable compensation), or enter into any new employment or severance agreements that would result in post-termination payments that in the aggregate would exceed $5,000 becoming due or payable upon termination of employment or of the individual independent contractor, or (iv) assume or enter into any labor or collective bargaining agreement relating to the Business, any Current Employee or future employee, or any Purchased Asset;

(f)    take any action which, if taken, or omit to take any act which, if omitted to be taken, would constitute or result in an "Event of Default" or "Default" under the Prepetition Loan Agreement, the DIP Credit Agreement or the DIP Order, as applicable;

(g)    permit, offer, agree or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien, except for Permitted Liens;

42

(h)     directly or indirectly, cancel, forgive, settle, or compromise any debt or claim or waive or release any right of Sellers (i) under the PHI MSA, or (ii) that constitutes a Purchased Asset;

(i)     do any other act that would, to Sellers' Knowledge, cause any representation or warranty of any Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect; or

(j)     authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

No Seller nor any of its Affiliates shall: (i) renew any Lease nor suffer any Person other than such Seller, its employees, agents, servants and invitees to occupy or use the premises or any portion thereof, without in any case the express written consent of Buyer, which consent shall not be unreasonably withheld, or (ii) terminate, amend, extend, renew, modify, breach, waive or allow any rights to lapse under any Lease.  If Sellers request such a consent from Buyer, the request shall be in writing specifying the terms of the renewal, termination, amendment, extension, modification and/or waiver, the identity of the proposed third party, assignee or sub-lessee; the duration of said desired sublease or renewal, the date same is to occur, the exact location of the space affected thereby and the proposed rentals on a square foot basis chargeable thereunder.  Such request for Buyer consent shall be submitted to Buyer at least five (5) days in advance of the date on which Sellers desire to make such event occur.

**Section 5.6     Notice of Developments**.  From the Execution Date until the Closing Date, each of Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.6 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

**Section 5.7     Access**.  Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during customary business hours, and in a manner so as not to interfere unreasonably with the regular business operations of Sellers, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

**Section 5.8     Press Releases and Public Announcements**.  Provided that Sellers shall provide notice to and consult with Buyer in advance, to the extent permitted by Law or the order of the Bankruptcy Court, Sellers shall be entitled to disclose, if required by applicable Law or by

43

order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Chapter 11 Cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Sellers shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication regarding Buyer without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed; provided, however, Sellers, without the prior consent of Buyer, may issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction. Buyer, without the prior consent of Sellers, may issue such press release or make such public statement, filing or disclosure (x) prior to Closing, as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction and (y) after Closing, as it may wish.

**Section 5.9      Bulk Transfer Laws**. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 5.10      Contracts**. If at any time Sellers become aware, on or before the Closing, of any heretofore unrejected Contract to which any of Sellers is a party that satisfies the conditions of Section 3.6, but has not been included on Schedule 3.6 of the Disclosure Schedule, Sellers shall promptly thereafter advise Buyer of the existence of such Contract and provide Buyer with a copy thereof. Buyer shall have the right, for a period of five (5) Business Days following the delivery of any such Contract, to review such Contract and during such period Sellers shall refrain from modifying, terminating or rejecting such Contract without Buyer's express prior written consent. Buyer shall have the option, exercisable by written notice to Sellers given within such five (5) Business Day period, to request that Sellers assume (if applicable), assign and sell such Contract to Buyer. If Buyer timely exercises such option, Sellers shall use commercially reasonable efforts to assume (if applicable), assign and sell such Contract to Buyer, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Assumed Contracts or the Prepetition Contracts to be acquired hereunder, as applicable; provided, however, that Buyer shall be responsible for the payment of any Cure Cost in connection with the assumption and assignment of such Assumed Contract (if applicable), except as otherwise provided in Section 2.6 and provided such Cure Cost is an Assumed Liability. If Buyer fails or declines to exercise such option, Sellers shall reject such Contract upon five (5) Business Days' notice to Buyer.

**Section 5.11      Casualty, Condemnation, Loss of Lease**.

(a)      If, prior to Closing, any Leased Real Property and the associated improvements or any part thereof shall be subject to a taking by any Governmental Entity through condemnation, eminent domain or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking) (collectively, "Condemnation"), Buyer shall have the option, but not obligation, to take title to the Purchased Assets relating to such affected Leased Real Property and improvements

44

notwithstanding such Condemnation.  At the Closing, Buyer, if its elects to accept such Leased Real Property that is subject to a Condemnation, shall succeed to (x) the rights of Sellers to the Condemnation proceeds, including insurance proceeds, with respect to a Condemnation ("Condemnation Proceeds"), and (y) the rights to settle any such Condemnation proceeding, and Buyer shall, at Closing succeed to the rights of Sellers to all required proofs of loss, assignments of claims and similar items.  If Buyer elects to accept such Leased Real Property in accordance with the preceding sentence, then Sellers, at Closing, shall assign to Buyer all right, title and interest to any claims or proceeds Sellers may have.  Sellers shall not settle any such proceedings without the consent of Buyer, such consent not to be unreasonably withheld or delayed.

(b)     If, prior to Closing, any Leased Real Property and the associated improvements or any part thereof shall be destroyed or damaged by fire, earthquake, flood or other casualty (collectively, "Casualty"), Buyer shall have the option, but not the obligation, to take title to the Purchased Assets relating to such affected Leased Real Property and improvements.  At the Closing, Buyer, if it elects to accept such Leased Real Property that is subject to a Casualty, shall succeed to (x) the rights of Sellers to the Casualty proceeds, including insurance proceeds, with respect to such Casualty ("Casualty Proceeds"), including without duplication, giving Buyer a credit against the Purchase Price in the amount of the Casualty Proceeds actually received by Sellers and not applied by Sellers to repair prior to Closing, and (y) the rights to settle after Closing any loss under all Insurance Policies applicable to the Casualty, and Buyer shall, at Closing and thereafter, succeed to the rights of Sellers to all required proofs of loss, assignments of claims and other similar items and Sellers shall, at Closing, assign same to Buyer.  Sellers shall not settle any such claims without the consent of Buyer; such consent not to be unreasonably withheld or delayed.

## ARTICLE VI.
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing; provided that Sellers' obligations hereunder shall only continue until the later of the day that (i) all Liquor Licenses have been transferred to Buyer and/or replacements thereof have been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (ii) the Chapter 11 Cases are closed or dismissed:

**Section 6.1     Cooperation**. Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2     Further Assurances**.  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall promptly take such further action (including the execution and delivery to any other Party of such other reasonable instruments

45

of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discover any additional assets or properties which the Parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and promptly execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.3      Availability of Business Records**.  From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) seven (7) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, or (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases.  Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain copies of all of Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense.

**Section 6.4      Employee Matters**.

(a)      Sellers shall, effective as of December 31, 2024 (or such other day as mutually agreed upon between Sellers and Buyer) (the "Employee Transfer Date"), discharge all Current Employees.  During the period from the Execution Date through the Employee Transfer Date (the "Interim Employment Term"):

(i)      Sellers shall continue to employ the Current Employees and employees of Sellers whose employment commenced on or after the Closing Date (collectively with the Current Employees, the "Employees"), and Sellers shall lease to Buyer and its Permitted Designees the Employees to continue to perform services for Buyer and its Permitted Designees with respect to the Business and the Continuing Restaurants commensurate with the work performed by such Employees on behalf of Sellers immediately prior to the Closing, as determined by Buyer in its sole discretion.

(ii)      The consideration payable by Buyer to Sellers for the Employee lease arrangement described in this Section 6.4(a) shall be the Services Fee for Operational Services, each as defined under the Transition Services Agreement.

46

(iii)    During the Interim Employment Term, Buyer and its Permitted Designees shall have the exclusive right to direct, assign and structure work for the Employees. Notwithstanding the foregoing, Sellers shall retain ultimate dominion and control of the Employees. Sellers shall direct each of the Employees to perform such Employee's duties and responsibilities on behalf of Buyer and its Permitted Designees. When performing duties on behalf of Buyer and its Permitted Designees, the Employees shall be under the supervision and direction of Buyer and its Permitted Designees. The right to supervise and direct the Employees with respect to any activities refers not only to the result to be accomplished, but also includes the details and means by which the result is accomplished. If, in the course of such supervision, Buyer and its Permitted Designees determine that any Employee is not performing his or her duties in an acceptable manner, Sellers shall promptly notify Employer in writing specifying in detail the area of concern.

(iv)    Sellers shall continue to provide all salary, benefits, workers' compensation and unemployment compensation coverage for the Employees at all times during the Interim Employment Term on the same basis and at the same rates, wages and other benefit levels as were provided to the Employees immediately prior to the Closing.

(v)    During the Interim Employment Term, the relationship between Sellers and Buyer and its Permitted Designees established by this Section 6.4(a) is that of independent contractors, and nothing in this Agreement will be construed to constitute the parties as principal and agent, employer and employee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The Employees shall solely be employees of Sellers for all purposes, including, without limitation, employee benefits and payment of federal, state, and local income, social security, unemployment, and other payroll and employment Taxes.

(b)    Prior to the Employee Transfer Date, Buyer may, but shall not be obligated to offer (or cause a designee of Buyer to offer) to employ those Employees desired to be employed by Buyer, in Buyer's sole discretion, to operate the Continuing Restaurants, with employment commencing as of the Employee Transfer Date. For purposes of this Agreement, each Employee who receives such an offer of employment shall be collectively referred to as an "Offeree." Prior to the Employee Transfer Date, Buyer will provide Sellers with a schedule setting forth a list of the names of all Offerees. Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee." Each Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)    Following the Execution Date:

(i)    Sellers shall allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the Employees who are members of executive management and other employees reasonably requested during normal business hours.

47

(ii)    Sellers shall not, nor shall Sellers authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate of any Seller, to (A) interfere with Buyer's or its Representatives' rights under Section 6.4(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment.

(iii)    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(iv)    Buyer shall not assume, and Sellers shall retain, any liability or obligation whatsoever of Sellers relating to any of the Employee Benefit Plans (other than as provided under Section 2.3(e)). Buyer shall not be responsible for group health continuation coverage under COBRA with respect to all employees of Sellers and their dependents and any other individual who is an "M & A qualified beneficiary" within the meaning of Treasury Regulation Section 54.4980B-9, Q&A-4 in connection with the Contemplated Transactions and associated with the Purchased Assets. Sellers shall cause any Employee Benefit Plan that is maintained solely for the benefit of employees of Sellers and their dependents and which does not cover any other employees of Sellers' Affiliates or Sellers' ERISA Affiliates to be terminated immediately prior to the Employee Transfer Date and Sellers shall withdraw and terminate participation in all Employee Benefit Plans immediately prior to the Employee Transfer Date.

(v)    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary, paid time-off and benefits and any other amounts due under any Employee Benefit Plan or compensation arrangement or as required under applicable Law that are due and payable on or prior to the Employee Transfer Date or in connection with the Contemplated Transactions with respect to all Employees no later than the date such wages or salary would normally be paid. Seller shall withhold, fund and remit all applicable payroll Taxes as required by Law on or prior to the Employee Transfer Date with respect to all Employees of Sellers as of such date.

(vi)    Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Employee Transfer Date with respect to all Transferred Employees. Buyer shall withhold and remit all applicable payroll Taxes as required by Law after the Employee Transfer Date with respect to Transferred Employees. In addition, as part of the wind-down expenses, Sellers shall (or shall cause its designee to) process all employee and Tax reporting covering the periods prior to the Employee Transfer Date in connection with the Excluded Employees and the Transferred Employees that will be required to be prepared and delivered after the Employee Transfer Date. Nothing herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring Buyer to continue any

48

specific Employee Benefit Plan or any other employee benefit plan or to continue the employment of any specific person.

(vii)    Nothing in this Agreement shall create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

(viii)    Sellers shall retain all Liability for WARN incurred prior to, on Employee Transfer Date or otherwise in connection with the Contemplated Transactions, including Buyer's failure to hire any Employee after the Employee Transfer Date.

**Section 6.5**    **Recording of Intellectual Property Assignments**.  All of the Intellectual Property Assignments shall be recorded and filed by Buyer with the appropriate Governmental Entities as promptly as practicable following the Closing.

**Section 6.6**    **Transfer Taxes**.  To the extent not exempt under Section 1146 of the Bankruptcy Code, each Seller shall pay any stamp, documentary, registration, transfer, added-value or similar Tax (each, a "Transfer Tax") imposed under any applicable Law in connection with the Contemplated Transactions. Each Seller and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence, with the Parties as required by applicable Law to file any such Tax Returns and the other Parties to join therein to the extent required under applicable Law.

**Section 6.7**    **Wage Reporting**.  Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.8**    **Collection of Accounts Receivable**.

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date, and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall

49

pay over to Buyer or its designee the amount of such payments.  In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates (but in any event within 5 Business Days of such receipt), any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed, good sold or services provided by Buyer after the Closing.

**Section 6.9**     <u>**Use of Name and Marks**</u>. Neither Sellers nor any of their respective Affiliates or Subsidiaries shall use, license or authorize any third party to use, any name, slogan, logo or trademark which is similar or deceptively similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Purchased Assets.

**Section 6.10**     <u>**Liquor License Approvals**</u>.

(a)     Sellers shall reasonably cooperate in a timely manner with Buyer in connection with Buyer's filings or any applications or other submittals with any Governmental Entity or third party (including the Texas Alcoholic Beverage Commission (the "<u>TABC</u>") and the California Department of Alcoholic Beverage Control (the "<u>CDABC</u>")) with respect to any of the Liquor Licenses and obtaining the necessary consents and approvals pertaining to the transfer and/or issuance of the Liquor Licenses to Buyer to enable Buyer or its Permitted Designee to sell and serve alcohol at each Continuing Restaurant on and after the Closing Date consistent with their respective current service hours and days of operation as of the Execution Date ("<u>Liquor License Approvals</u>"), including if deemed necessary by Buyer, by entering into the Management Agreement(s) and, if reasonably requested by Buyer, initiating and/or participating, at Buyer's sole cost and expense, in such legal proceedings reasonably requested by Buyer to obtain such Liquor License Approvals; <u>provided</u>, <u>however</u>, that (i) to the extent that the applicable Governmental Entity (including the TABC and the CDABC) requires that a new license be purchased, the purchase price for such Liquor Licenses shall be paid by Buyer, without an adjustment to the Purchase Price, (ii) Buyer shall be responsible for all costs and fees charged by any third party, including but not limited to any escrow fee and fees for the processing of any vendor claims submitted to Buyer related to the Liquor Licenses for periods prior to Closing and this obligation of Buyer shall survive the Closing, and (iii) Buyer shall be responsible for all costs and fees charged by any third party, including but not limited to any escrow fee and fees for the processing of any vendor claims submitted to Buyer related to the Liquor Licenses for periods from and after Closing, to the extent arising from or relating to the Liquor Licenses, after Closing, and these obligations of Buyer shall survive the Closing.

(b)     Prior to Closing, Sellers shall notify Buyer within five (5) Business Days of (i) the receipt from any applicable Governmental Entity, including the TABC and the CDABC, of any complaint or notification of violation or (ii) any event of suspended

50

operations occurring of any of the Continuing Restaurants, which in the case of either provision (i) or (ii), are related to the Liquor Licenses.

(c)     Sellers and Buyer acknowledge that due to the procedures established by the applicable Governmental Entities (including the TABC and the CDABC) for the transfer of Liquor Licenses, Sellers may be operating the Continuing Restaurants for the benefit of Buyer for an undetermined period of time following the approval of the transfer of the Liquor Licenses from Sellers to Buyer by the applicable Governmental Entities (including the TABC and the CDABC) through the Closing.

(d)     In the event that the issuance of new Liquor Licenses to Buyer or the suitable transfer of Sellers' existing Liquor Licenses for each Continuing Restaurant to Buyer cannot be obtained by Buyer from the applicable Governmental Entities (including, the TABC and the CDABC) prior to Closing for one (1) or more Liquor Licenses (including without limitation, temporary Liquor Licenses until permanent Liquor Licenses are transferred to or obtained by Buyer), to the extent permitted by Law, Buyer and Seller shall enter into one or more Management Agreements, in form and substance substantially similar to Exhibit E to this Agreement in order to permit Buyer to operate the Business and utilize the Liquor License for each Continuing Restaurant during the period commencing upon the Closing Date and terminating upon the receipt of the applicable Liquor Licenses for each respective Continuing Restaurant as issued to Buyer or its designated Affiliate and/or Subsidiary by the applicable Governmental Entities (including the TABC and the CDABC).

**Section 6.11   Data Privacy Protection**.  Buyer acknowledges that the Purchased Assets include personally identifiable information ("PII") within the meaning of Section 363(b) of the Bankruptcy Code, along with associated personal information about Sellers' customers. In connection with the same, Buyer agrees to: (i) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (ii) abide by all applicable Laws and regulations with respect to PII and (iii) take such further actions with respect to PII as may be agreed between the Parties.  Sellers agree to take such action reasonably requested by Buyer, including amending their privacy policies with respect to PII, as may be necessary to transfer the PII to Buyer, including sending a notice to the subjects of the PII and giving each such subject the right to object to the transfer of the PII.  Buyer agrees that it shall, absent a customer's consent received after adequate notice: (a) abide by Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent make Buyer aware of such requests; provided that Buyer shall seek to obtain such information from Sellers) and (c) use personal information only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Purchased Assets.  Buyer shall use its reasonable commercial efforts to obtain the consent of a customer for any additional use of PII or personal information or before making material changes to Sellers' privacy policies that weaken a customer's consumer protection.  Furthermore, to the extent PII includes any social security numbers, Buyer shall limit such use to Tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

## ARTICLE VII.
## CONDITIONS TO CLOSING

**Section 7.1    Conditions to Buyer's Obligations**.    Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    As of the Execution Date and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1 through Section 3.3 and Section 3.5 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in ARTICLE III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.8(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Sale Procedures Order and the Sale Order are both in form and substance acceptable to Buyer;

(e)    the Sale Order and Sale Procedures Order shall have been entered by the Bankruptcy Court, which shall include a waiver of the fourteen (14) day stay set forth in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, and shall be final, non-appealable orders;

(f)    from the Execution Date until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and

(g)    Sellers shall have delivered a certificate from an authorized officer of each Seller to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b), and Section 7.1(f) has been satisfied.

**Section 7.2    Conditions to Sellers' Obligations**.    Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver of the following conditions:

52

(a)      as of the Execution Date and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1 through Section 4.3 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in ARTICLE IV shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or the transactions contemplated by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" contained in such representations and warranties shall be disregarded;

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.8(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)      no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the Sale Order entered by the Bankruptcy Court and shall not be subject to a stay pending appeal; and

(e)      Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3     No Frustration of Closing Conditions**.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

## ARTICLE VIII.
## TERMINATION

**Section 8.1     Termination of Agreement**.  This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the Closing:

(a)      by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)      by either Buyer or Sellers if there shall be any applicable Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited or if

53

consummation of the Contemplated Transactions would violate any nonappealable final order, decree or judgment of any Governmental Entity having competent jurisdiction;

(c)     by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event any Seller has breached any covenant contained in this Agreement in any material respect such that the conditions set forth in Section 7.1 shall become incapable of being satisfied without cure, Buyer has notified Sellers of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.1 shall become incapable of being satisfied, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(d)     by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any covenant contained in this Agreement in any material respect such that any condition set forth in Section 7.2 shall become incapable of being satisfied without cure, Sellers have notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.2 shall become incapable of being satisfied, unless such failure shall be due to the failure of any Seller to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Sellers;

(e)     by Buyer, on the one hand, or Sellers, on the other hand, if the Closing shall not have occurred by five (5) days after the Sale Order Deadline; provided, however, that neither Buyer nor Sellers may terminate this Agreement under this Section 8.1(e) if such failure is due to the failure of such Party to perform or comply with the covenants hereof to be performed or complied with by it/them prior to the Sale Order Deadline;

(f)     by Buyer if an "Event of Default" or "Default" is declared by the appliable administrative agent or lender(s) under the DIP Order or the DIP Credit Agreement, as applicable;

(g)     by Buyer if for any reason whatsoever, Buyer is unable to Credit Bid the Purchase Price pursuant to Section 2.5(a);

(h)     by Buyer if (i)  the Sale Order shall not have been entered by the Bankruptcy Court by the Sale Order Deadline, (ii) any of Sellers files (y) any motion with the Bankruptcy Court seeking an order approving, or (z) any Plan involving, any Alternate Transaction, (iii)  Sellers enter into a definitive agreement with a third party for an Alternate Transaction, or (iv) prior to the Closing, the Chapter 11 Cases shall be converted into a case(s) under chapter 7 of the Bankruptcy Code or dismissed; or

(i)     automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately:

(i)      upon the issuance of a final and non-appealable order, decree, or ruling by a Governmental Entity to permanently restrain, enjoin or otherwise prohibit the Closing;

(ii)      upon approval by the Bankruptcy Court of an Alternate Transaction; or

(iii)      upon the consummation of an Alternate Transaction.

Notwithstanding anything to the contrary contained herein, in no event may Buyer terminate this Agreement under Section 8.1(b) or Section 8.1(d) solely on account of Buyer's failure to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract or on account of Buyer's failure to comply with the covenants set forth in this Agreement.

**Section 8.2**    **Procedure Upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3**    **Effect of Termination**.

(a)      Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from liability for any breach of covenant occurring prior to any termination of this Agreement.

(b)      No termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made.  If the Contemplated Transactions are not consummated (a) this Agreement shall become null and void and of no further force and effect (except that ARTICLE I (Definitions), ARTICLE IX (Miscellaneous), and this ARTICLE VIII (Termination) shall survive any such termination); and (b) if this Agreement is terminated by Buyer pursuant to a termination right set forth in this ARTICLE VIII or by Sellers for any reason other than under Section 8.1(d), Sellers shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further liability of any kind to Sellers, any of its Affiliates, or any third party on account of this Agreement.

(c)      Nothing herein shall preclude Buyer or Sellers from exercising their respective remedies under Section 9.1.

## ARTICLE IX.
## MISCELLANEOUS

**Section 9.1**    **Remedies**. Each of Buyer and Sellers recognizes that if it breaches or refuses to perform any covenant set forth in this Agreement, monetary damages alone would not be adequate to compensate the other Party for its injuries.  Each Party shall therefore be entitled,

55

in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by a Party to enforce such covenants, the other Party against which such Litigation is subject shall waive the defense that there is an adequate remedy at Law. Buyer and each Seller agrees to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. Buyer and each Seller agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

Section 9.2 **Expenses**. Except as otherwise provided in this Agreement or a Related Agreement, each of Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, but not limited to, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

Section 9.3 **Entire Agreement**. This Agreement and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof. The recitals set forth above are expressly incorporated herein by reference.

Section 9.4 **Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5 **Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

56

Section 9.6 **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer may elect to have any or all of the Purchased Assets conveyed or transferred to, or any or all of the Assumed Liabilities assumed by, one or more of its Permitted Designees without the consent of any of Sellers; provided, however, Buyer shall remain liable for all of its obligations to Sellers under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

Section 9.7 **Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) when sent by email (with written confirmation of transmission), or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller, then to:

> Chief Restructuring Officer
> c/o CR3 Partners, LLC
> 13355 Noel Rd.
> Suite 2005
> Dallas, Texas 75240
> Attention:  William Snyder
> Email: william.snyder@cr3partners.com

with a copy to:

> Gray Reed & McGraw LLP
> 1601 Elm Street, Suite 4600
> Dallas, Texas 75201
> Attention: Amber Carson
> Email: acarson@grayreed.com

If to Buyer, then to:

> BDB Intermediate, LLC
> c/o Main Street Capital Corporation
> 1300 Post Oak Blvd.
> 8th Floor
> Houston, TX 77056
> Attn: Diego Fernandez
> Email:  dfernandez@mainstcapital.com

57

with copies (which shall not constitute notice) to:

> Porter Hedges LLP
> 1000 Main Street
> 36th Floor
> Houston, TX 77002
> Attn: Brian G. Rose and Joshua W. Wolfshohl
> Email: brose@porterhedges.com / jwolfshohl@porterhedges.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 9.7</u>.

**Section 9.8** **<u>Governing Law; Jurisdiction</u>**. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; <u>provided</u> that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Texas, sitting in Dallas County, Texas, and the federal courts of the United States of America sitting in Dallas County, Texas, shall have exclusive jurisdiction over such Litigation.

**Section 9.9** **<u>Consent to Service of Process</u>**. Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9.7</u>.

**Section 9.10** **<u>WAIVERS OF JURY TRIAL</u>**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 9.11** **<u>Severability</u>**. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other

58

Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 9.12    **No Third Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

Section 9.13    **No Survival of Representations, Warranties and Agreements**. None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of any other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, (ii) this ARTICLE IX, and (iii) all defined terms set forth in ARTICLE I that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above.

Section 9.14    **Construction**.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation."  The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement.  Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the Execution Date."  Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement.  Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time.  Any reference herein to "dollars" or "$" means United States dollars.

Section 9.15    **Computation of Time**.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

Section 9.16    **Mutual Drafting**.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.17    Disclosure Schedule**.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, but only to the extent that such relationship is reasonably apparent on the face of the disclosure contained in the Disclosure Schedule.  The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the disclosure of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties and/or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced.

**Section 9.18    Headings; Table of Contents**. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.19    Counterparts; Facsimile and Email Signatures**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile, email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

**Section 9.20    Time of Essence**.  Time is of the essence of this Agreement.

[SIGNATURE PAGES FOLLOW]

60

15604874v4

SimplyAgree Sign Signature Packet ID: 0a59a18a-24a6-49e3-82ac-2473a3987c25

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLERS**:

**BUCA C, LLC,**
a Florida limited liability company

By:  *William Snyder*
Name:  William Snyder
Title:   Chief Restructuring Officer

**BUCA TEXAS RESTAURANTS, L.P.,**
a Texas limited partnership

By:      BUCA RESTAURANTS, INC.,
             its general partner

By:  *William Snyder*
Name:  William Snyder
Title:   Chief Restructuring Officer

**BUCA TEXAS BEVERAGE, INC.,**
a Texas corporation

By:  *William Snyder*
Name:  William Snyder
Title:   Chief Restructuring Officer

**BUCA SALES & MARKETING, LLC,**
a Florida liability company

By:  *William Snyder*
Name:  William Snyder
Title:   Chief Restructuring Officer

**SELLERS, continued**:

**BUCA INVESTMENTS, INC.,**
a Minnesota corporation


By: _*William Snyder*_____
Name: William Snyder
Title:   Chief Restructuring Officer


**BUCA RESTAURANTS, INC.,**
a Minnesota corporation


By: _*William Snyder*_____
Name: William Snyder
Title:   Chief Restructuring Officer


**BUCA RESTAURANTS 2, INC.,**
a Minnesota corporation


By: _*William Snyder*_____
Name: William Snyder
Title:   Chief Restructuring Officer


**BUCA (CELEBRATION), LLC,**
a Florida limited liability company


By: _*William Snyder*_____
Name: William Snyder
Title:   Chief Restructuring Officer

**SELLERS, continued**:

**BUCA (EX), LLC,**
a Florida limited liability company


By: _William Snyder_____
Name:  William Snyder
Title:   Chief Restructuring Officer

**BUCA (MINNEAPOLIS), INC.,**
a Minnesota corporation


By: _William Snyder_____
Name:  William Snyder
Title:   Chief Restructuring Officer

[Signature page to Asset Purchase Agreement]

SimplyAgree Sign signature packet ID: a7deab24-8256-4203-a68c-7a75a21ed6b

**BUYER:**

**BDB INTERMEDIATE, LLC**
a Delaware limited liability company

By:_____
Name:  Diego Fernandez
Title:   Authorized Representative

[Signature page to Asset Purchase Agreement]